# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| MARTA REYES; LAWRENCE WOOD;<br>STEPHEN CLYNE and THE PITCHING LAB<br>d/b/a TBT TRAINING; TODD KUNTZE;<br>SAUNDRA ANDRINGA-MEUER;<br>JESSICA MERRITT; JOHN VECCHIARELLO;<br>LINDA IGLESIAS; CONSTANCE GREENE;<br>BRYAN EADS; JENNIFER MITCHELL, as<br>Personal Representative of the Estate of James<br>Mitchell; LORRAINE CAGGIANO MAIORINO;<br>RAY BODINE; GEORGE ROGOZINSKI;<br>KIMBERLY ELLER; SHERRY WERNER;<br>WILLIAM DAMELIO; JUDY HART;<br>SB HOLDINGS I, LLC; ROBERT JARVIS;<br>SEAGRASS RESORT, LLC;<br>BILL MCCUTCHEON; DR. ANDREW<br>NEWMAN; MR. M'S SANDWICH SHOP, INC.;<br>JUPITER DONUTS; GALLERY ART GROUP, INC.;<br>SOUTH FLORIDA SURFING CORP. d/b/a<br>ISLAND WATER SPORTS MIAMI;<br>SAMSON TOURS INC.; EAST AIR<br>CORPORATION; ROBERT SHAFFER; and<br>KARL UMBACH; on behalf of themselves,<br>and all those similarly situated, | CASE NO. 1:20-cv-21108-UU<br>HON. URSULA UNGARO<br>Miami Division<br>CLASS ACTION |

    Plaintiffs,

v.

PEOPLE'S REPUBLIC OF CHINA;
COMMUNIST PARTY OF CHINA;
NATIONAL HEALTH COMMISSION
OF THE PEOPLE'S
REPUBLIC OF CHINA;
WUHAN HEALTH COMMISSION;
HUBEI HEALTH COMMISSION;
THE PEOPLE'S GOVERNMENT OF HUBEI
PROVINCE; THE PEOPLE'S GOVERNMENT
OF CITY OF WUHAN, CHINA; and WUHAN
INSTITUTE OF VIROLOGY, CHINESE
ACADEMY OF SCIENCES,

Defendants.
_____/

**FIRST AMENDED CLASS ACTION COMPLAINT**

Pursuant to Fed.R.Civ.P. 15(a), Plaintiffs, MARTA REYES, LAWRENCE WOOD, STEPHEN CLYNE, THE PITCHING LAB LLC d/b/a TBT TRAINING, TODD KUNTZE, SAUNDRA ANDRINGA-MEUER, JESSICA MERRITT, JOHN VECCHIARELLO, LINDA IGLESIAS, CONSTANCE GREENE, BRYAN EADS, JENNIFER MITCHELL, as Personal Representative of the Estate of James Mitchell, LORRAINE CAGGIANO MAIORINO, RAY BODINE, GEORGE RODOZINSKI, KIMBERLY ELLER, SHERRY WERNER, WILLIAM DAMELIO, JUDY HART, SB HOLDINGS I, LLC, ROBERT JARVIS, SEAGRASS RESORT, LLC, BILL MCCUTCHEON, DR. ANDREW NEWMAN, MR. M'S SANDWICH SHOP, INC., JUPITER DONUTS, GALLERY ART GROUP, INC.; SOUTH FLORIDA SURFING CORP. d/b/a ISLAND WATER SPORTS MIAMI, SAMSON TOURS INC., EAST AIR CORPORATION, ROBERT SHAFFER, and KARL UMBACH (collectively, "Named Plaintiffs"), on behalf of themselves and all those similarly situated, and by and through their undersigned counsel, hereby file their First Amended Complaint and sue the PEOPLE'S REPUBLIC OF CHINA ("the PRC"); COMMUNIST PARTY OF CHINA ("the CCP"); NATIONAL HEALTH COMMISSION OF THE PEOPLE'S REPUBLIC OF CHINA; WUHAN HEALTH COMMISSION; HUBEI HEALTH COMMISSION; THE PEOPLE'S GOVERNMENT OF HUBEI PROVINCE; THE PEOPLE'S GOVERNMENT OF CITY OF WUHAN, CHINA; and WUHAN INSTITUTE OF VIROLOGY, CHINESE ACADEMY OF SCIENCES ("WIV") (collectively "Defendants"), for damages, and further allege as follows:

## INTRODUCTION

1.      This is class action brought by the Named Plaintiffs, individuals and business owners in the United States, State of Florida and various other states, for damages suffered as a result of the Coronavirus pandemic, against Defendants: the CCP, the PRC and its various government entities overseeing the response to the Coronavirus pandemic in China generally and within Hubei Province and the City of Wuhan; and WIV, an arm of the Chinese Academy of Sciences.

2.      The world has been devastated by the Coronavirus/COVID-19 pandemic. The virus began in Wuhan, Hubei Province, China prior to December 2019, and has spread throughout the world.  As of this filing, the United States has the highest number of cases (almost 1,200,000), and deaths (over 68,000).

3.      The CCP, the PRC and the other Defendants knew that COVID-19 was dangerous and capable of causing a pandemic, yet deceived the world, actively concealed it until it was too late, and failed to contain it when they could have, because of economic self-interest.  Defendants' malfeasance, misfeasance, and/or nonfeasance caused the pandemic.

4.      The conduct of Defendants has caused injury and incalculable harm to Named Plaintiffs and Class Members, and such injury and harm will only multiply in coming days and weeks.  The Defendants' conduct has caused and will continue to cause personal injuries and deaths, economic disruption, and other damages.

## PARTIES

### *Named Plaintiffs*

5.      MARTA REYES is a resident of Miami-Dade County, Florida, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris.*  She has suffered great financial losses due to the pandemic.

6.      LAWRENCE WOOD is a resident of Palm Beach County, Florida, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris.*  His business has suffered substantial losses due to the pandemic.

7.      STEPHEN CLYNE is a resident of Palm Beach County, Florida, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris.* He has suffered great financial losses due to the pandemic.

8.      THE PITCHING LAB LLC d/b/a TBT Training ("TBT Training"), is a Florida limited liability company that has been injured and damaged by Defendants' conduct.  The business is a training facility to the public that has lost its business due to COVID-19.

9.      TODD KUNTZE is a resident of Broward County, Florida, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*.  He was diagnosed with COVID-19, and was hospitalized.

10.      SAUNDRA ANDRINGA-MEUER is a resident of Madison, Wisconsin, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*.  She was diagnosed with COVID-19, and was hospitalized.

11.      JESSICA MERRITT is a resident of Broward County, Florida, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*.  She was diagnosed with COVID-19, and suffered personal injury.

12.     JOHN VECCHIARELLO is a resident of Monroe, New York, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. He has been directly exposed to COVID-19 from a family member who contracted COVID-19, and is also a business owner who has suffered substantial losses.

13.     LINDA IGLESIAS is a resident of New York, New York, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. She was directly exposed to COVID-19 due to her job working with the public.

14.     CONSTANCE GREENE is a resident of Broward County, Florida, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. She was directly exposed to COVID-19 due to her work environment.

15.     BRYAN EADS is a resident of Leland, Illinois, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. He is/was directly exposed to COVID-19 from a family member who contracted COVID-19, and due to his job working with the public.

16.     JENNIFER MITCHELL, individually and as Personal Representative of the Estate of James Mitchell, is a resident of Hillsborough County, Florida, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. James Mitchell died as a result of COVID-19, and Ms. Mitchell is his survivor. She is also suffering from severe emotional distress.

17.     LORRAINE CAGGIANO MAIORINO is a resident of Yonkers, New York, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. She has tested positive for COVID-19 and has had family members die from COVID-19, and is their survivor.

18.    RAY BODINE is a resident of Richardson, Texas, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. He has had a family member die from COVID-19, and is a survivor.

19.    GEORGE ROGOZINSKI is a resident of Carlstadt, New Jersey, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. His wife died from COVID-19 and he is her survivor.

20.    KIMBERLY ELLER is a resident of Savannah, Georgia, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. She is suffering from severe emotional distress due to the pandemic and its effects.

21.    SHERRY WERNER is a resident of Filer, Idaho, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. She is suffering from severe emotional distress due to the pandemic and its effects.

22.    WILLIAM DAMELIO is a resident of Palm Beach County, Florida, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. He is an independent contractor who has lost substantial business and income due to the pandemic.

23.    JUDY HART is a resident of Orange County, California, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. She has lost her job and income due to the pandemic.

24.    SB HOLDINGS I, LLC is a Florida limited liability corporation in Orlando, Florida, that has been injured and damaged by Defendants' conduct. As a hotel operator, the business has suffered substantial losses due to the pandemic.

6

25.     ROBERT JARVIS is a resident of Kissimmee, Florida, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. He owns hotel properties near Disneyworld, and the business has suffered substantial losses due to the pandemic.

26.     SEAGRASS RESORT, LLC is a Florida limited liability company located in Citrus County, Florida, that has been injured and damaged by Defendants' conduct, as described herein.  The restaurant, bar, and hotel depends on tourism for its business, and the business has suffered substantial losses due to the pandemic.

27.     BILL MCCUTCHEON is a resident of Yakutat, Alaska, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. He runs a tourism business and the business has suffered substantial losses due to the pandemic.

28.     DR. ANDREW NEWMAN is a resident of Merrick, New York, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*.  Dr. Newman owns a dental practice and the business has suffered substantial losses due to the pandemic.

29.     MR. M'S SANDWICH SHOP, INC. is a Florida corporation in Broward County, Florida, that has been injured and damaged by Defendants' conduct, as described herein.  The restaurant has suffered substantial losses due to the pandemic.

30.     JUPITER DONUTS is a Florida entity in Palm Beach County, Florida, that has been injured and damaged by Defendants' conduct, as described herein.  The business is comprised of multiple donut and food restaurants, and they have suffered substantial losses due to the pandemic.

31.     GALLERY ART GROUP, INC. is a Florida corporation based in Miami-Dade County, Florida, that has been injured and damaged by Defendants' conduct as described herein.  The fine art gallery and related services business has suffered substantial losses due to the pandemic.

32.     SOUTH FLORIDA SURFING CORP. d/b/a ISLAND WATER SPORTS MIAMI, is a Florida corporation based in Miami-Dade County, Florida, that has been injured and damaged by Defendants' conduct as described herein.  The surfing and watersports gear and supplies business has suffered substantial losses due to the pandemic.

33.     SAMSON TOURS INC. is a Georgia corporation based in Atlanta, Georgia, that has been injured and damaged by Defendants' conduct, as described herein.  The charter bus and transportation company has suffered substantial losses due to the pandemic.

34.     EAST AIR CORPORATION is a New Jersey corporation located in Hackensack, NJ, that has been injured and damaged by Defendants' conduct, as described herein.   The commercial and defense related aviation parts and logistics company has suffered substantial losses due to the pandemic.

35.     ROBERT SHAFFER is a resident of El Paso, Illinois who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*. He owns a farming, livestock, and agricultural business and the business has suffered substantial losses due to the pandemic.

36.     KARL UMBACH is a resident of Whitewater, Kansas, who has been injured and damaged by Defendants' conduct, as described herein, and is otherwise *sui juris*.

He owns a farming, livestock, and agricultural business and the business has suffered substantial losses due to the pandemic.

37.    Class Members are those individuals and entities similarly situated to Named Plaintiffs, and will number in the millions.

**Defendants**

38.    The CCP is the ruling political party of China, whose leader becomes the president of the PRC.  The CCP is an organization that is independent of the PRC, and it is not a political subdivision of the PRC.  The CCP is not protected by sovereign immunity. *See*, *e.g.*, *Yaodi Hu v. Communist Party of China*, Case No. 1:12-cv-1213,  2012 U.S. Dist. LEXIS 186286, at *7 (W.D. Mich. Nov. 20, 2012) (finding that the CCP and individual government officials are not entitled to immunity under the Foreign Sovereign Immunities Act).

39.    The CCP is not an agent, instrumentality, or organ of the PRC, but instead, upon information and belief, the CCP exercises direction and control over the actions of all other Defendants.

40.    The PRC is a foreign state in East Asia and is the world's most populous country.

41.    The National Health Commission of the People's Republic of China ("NHC") is an administrative government body/executive department responsible for national health and health policies of the PRC, but answering to the CCP.

42.    Wuhan Health Commission ("WHC") is similar to the NHC at the local  level for the City of Wuhan, and also answers to the CCP.

43.     Hubei Health Commission ("HHC") is similar to the NHC at the provincial level for Hubei Province, and also answers to the CCP.

44.     The People's Government of Hubei Province ("Hubei Province") is a foreign province and administrative head of Hubei Province in the PRC, and also answers to the CCP.

45.     The People's Government of City of Wuhan, China ("Wuhan") is a foreign city and administrative head of the City of Wuhan, PRC, and also answers to the CCP.

46.     On information and belief, at all relevant times, the PRC, NHC, WHC, HHC, Hubei Province, and Wuhan (collectivity, the "Chinese Government Defendants") acted in concert with one another and acted as agents and/or principals of one another in relation to the conduct described herein.

47.     WIV has both a "level 4" and "level 3" virology lab located in Wuhan and it is a research institute that studies infectious diseases, pathogens, and viruses, among other topics.  It is an arm of the Chinese Academy of Sciences, which controls it.  Its level 4 and level 3 labs are supposed to have the highest levels of security and containment.

48.     One of the main goals of the Chinese Academy of Sciences ("CAS"), which operates WIV, is to commercialize its work and partner with commercial market participants.  For example, its "About Us" page states that it "promotes long-term, strategic partnerships with first-rate research institutions, international science organizations and multinational research and development corporations."[1]  It also creates

_____

[1] "About Us," Chinese Academy of Sciences, available at: http://english.cas.cn/about_us /introduction/201501/t20150114_135284.shtml.

market participant companies, further stating: "In 2014 alone, over 700 CAS spin-off companies have grossed about RMB 350 billion (US$56 billion)."[2]

49. Indeed, it is well known that private multi-national pharmaceutical companies, and research labs (such as from U.S. universities) participate in, fund, and maintain labs and projects at WIV. These are business transactions between CAS and private entities, where CAS is a market participant like a private research lab. The entities CAS contracts with engage in similar transactions — contracting with or joint venturing with private research labs — as part of their world-wide research efforts.

50. On information and belief, at all relevant times, WIV and the Chinese Government Defendants acted in concert with one another and acted as agents and/or principals of one another in relation to the conduct described herein.

**JURISDICTION AND VENUE**

51. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1330(a), 28 U.S.C. § 1332 (a), and the Class Action Fairness Act of 2005 (CAFA; 28 U.S.C. § 1332(d)). The matter concerns a foreign state and its sub-divisions and instrumentalities. It is also a controversy that, exclusive of interest and costs, exceeds the sum or value of $5,000,000, where there exists minimal diversity between parties, and there are millions of putative class members.

52. With regard to the Chinese Government Defendants and WIV, this Court further has jurisdiction under the Foreign Sovereign Immunities Act (FSIA) of 1976, 28 U.S.C. §§ 1602 *et seq*., and particularly the exceptions of § 1605(a)(2) (for acts outside the territory of the United States in connection with a commercial activity of the

---

[2] *Id.*

Defendants, that cause a direct effect in the United States), and § 1605(a)(5) (for money damages for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious acts or omissions of Defendants, or of any official or employee of Defendants while acting within the scope of his office or employment).

53.     A commercial activity pursuant to § 1605(a)(2) is defined to be "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." § 1603(d).

54.     Defendants were market participants in commercial activities such as:  1) commercialized research on viruses (including the creation of stand-alone companies and joint ventures and joint funding efforts with private U.S. and multi-national corporations, and U.S. universities); the cultivation, trade, import, and sale of exotic animals for the "wet markets"; participating in the operations of the "wet markets" themselves; funding and operation of electronic information exchanges and social media platforms; and the funding and operation of a healthcare system.

55.     It should be noted that the safe harbor language of "discretionary acts" of a sovereign, included in § 1605(a), only modifies § 1605(a)(5) (non-commercial torts).  But to the extent it could apply at all, nothing in Defendants' culpable behavior was discretionary, rather it was intentional.  Moreover, under the law developed since enactment of the FSIA, the "discretionary acts" safe harbor does not apply where, such as here:  1) the Chinese Government Defendants and WIV have acted clearly contrary to

the precepts of humanity; 2) their conduct is prohibited by the internal laws of the PRC and its provincial and municipal governments; and 3) they failed to warn of a known danger.

56.     The Chinese Government Defendants and WIV have acted egregiously in their culpable conduct and the unleashing of this virus on the world is clearly contrary to the precepts of humanity.  Moreover, they have not adhered to the laws and regulations governing the operation of their virology lab, and the "wet markets" (or the trade and sale of many of the animals found in them) were outlawed.  Finally, they clearly knew of the danger of the virus, the ease of human-to-human transmission, and its dangerous tendencies and failed to warn about it, and instead actively concealed it.

57.     The torts described herein occurred in the United States, in that: 1) Defendants set in motion forces that had their direct impact within our borders; 2) Defendants allowed asymptomatic carriers of COVID-19 to leave Wuhan (and other parts of China) who, when within our borders, then triggered, and spread the virus; and 3) Defendants' agents within the U.S., such as at the Chinese embassy and the 5 regional consulates, and other offices, participated in the same active concealment and failure to warn of the virus despite knowledge of it.

58.     Moreover, this Court has jurisdiction for the torts alleged in this Complaint pursuant to 28 U.S.C. § 1605B, because Defendants have caused personal injury and death in the United States, and have met the definition of 18 U.S.C. 2331(1) because their acts have been dangerous to human life and violations of criminal laws; have intimidated and coerced, and affected the conduct of the government by mass devastation; and have transcended national boundaries in terms of the means by which

their acts have been accomplished.  Moreover, the acts described herein were carried out by a foreign state or its agents, and rise above mere negligence.

59.    Although the CCP, which directs and controls all activities in the PRC, is not a foreign state and is not subject to the FSIA, to the extent the Court disagrees, then the FSIA related jurisdictional allegations herein should be read to include the CCP.

60.     This Court has jurisdiction over Defendants because Defendants have caused tortious harm to Named Plaintiffs and Class Members, throughout the United States, including within Florida and this District, and have sufficient contacts in Florida and this District to render the exercise of jurisdiction by this Court permissible.

61.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to Named Plaintiff's and Class Members' claims occurred in this District.

62.    All conditions precedent to the filing of this lawsuit have been met and/or waived by the conduct of Defendants.

**GENERAL ALLEGATIONS**

*The Roots of COVID-19 – WIV Labs*

63.    It is generally accepted that COVID-19/SARS-CoV-2 originated in Wuhan, but there are several theories as to how, and the theories also cross in application.  Two of the prevailing theories are that: 1) the virus came from WIV and either its "P4" "level 4" or P3 labs; and 2) it originated by natural zoonotic (animal to human) transmission because of the "wet markets" and related animal trade.

64.    WIV has been a source of much scrutiny during the pandemic.  At the center of the scrutiny is Dr. Shi Zhengli, who is known in China as the "bat woman," and who

has been at the forefront of studying how bats, horseshoe bats in particular, are reservoirs of SARS-like coronaviruses.  Since 2004, after the original SARS outbreak, she has been collecting bats from Chinese caves in Yunnan province and eventually studying them at WIV in the P4 and P3 labs.[3]

65.    Dr. Shi has been prolific in publishing reports of her work over the years. Starting in 2010, she and her team began focusing on the "S" proteins that are the "spikes" seen in the illustrations of COVID-19, and how they might interact with ACE2 receptor cells, such as those in humans, which would allow a coronavirus to pass from bat to human without an intermediate host animal.[4]

66.    In 2013, she and her team published an article in the journal *Nature* announcing a breakthrough that they had found and isolated horseshoe bat coronaviruses that closely resembled SARS-CoV viruses, and one with an S protein that integrated with human ACE2 receptor cells.[5] The paper stated:  "Our results provide the strongest evidence to date that Chinese horseshoe bats are natural reservoirs of SARS-CoV, and that intermediate hosts may not be necessary for direct human infection by some bat SL-CoVs."[6]

---

[3] Jane Qiu, *How China's 'Bat Woman' Hunted Down Viruses from SARS to the New Coronavirus*, Scientific American (April 27, 2020), available at: https://www.scientificamerican.com/article/how-chinas-bat-woman-hunted-down-viruses-from-sars-to-the-new-coronavirus1.

[4] Joshua Philipp, *Tracking Down the Origins of Wuhan Coronavirus*, Epoch Times Documentary (Apr. 14, 2020), available at https://www.theepochtimes.com/coronavirusfilm.

[5] *Id.*

[6] *Isolation and Characterization of Bat SARS-Like Coronavirus that Uses the ACE2 Receptor*, Nature (Nov. 28, 2013), available at https://www.ncbi.nlm.nih.gov/pubmed/24172901.

67.    In November 2015, she and her team published another breakthrough in *Nature Medicine* titled: "A SARS-like Cluster of Circulating Bat Coronaviruses Shows Potential for Human Emergence."  A key excerpt from this article states:

> On the basis of these findings, we *synthetically re-derived* an infectious full-length SHC014 recombinant virus and demonstrate robust viral replication both *in vitro* and *in vivo*. Our work suggests a potential risk of SARS-CoV re-emergence from viruses currently circulating in bat populations.

Dr. Shi fully admitted that she was synthetically working with the "spikes" of the virus and increasing their ability to attach to human receptor cells.[7]  This synthetic manipulation is also known as "gain of function" research.   This synthetic bat-derived virus could easily transmit to humans.

68.    Dr. Shi's manipulation of deadly viruses that eased human infection drew criticisms.  Simon Wain-Hobson, a virologist at the Pasteur Institute in Paris, pointed out shortly after the paper was published, that the researchers had created a novel virus that "grows remarkably well" in human cells, and that "[i]f the virus escaped, nobody could predict the trajectory."[8]

69.    Labs such as WIV have been the source of pathogen leaks before, and in 2017 *Nature* published an article about how the international research community was particularly concerned that there could be a leak from WIV's labs, and noted that because

---

[7]  Nat. Med. 21, 1508–1513 (2015) (emphasis supplied), available at: https://www.nature.com/articles/ nm.3985.

[8]  Declan Butler, *Engineered Bat Virus Stirs Debate Over Risky Research*, Nature (Nov. 12, 2015), available at https://www.nature.com/news/engineered-bat-virus-stirs-debate-over-risky-research-1.18787.

of the ultra-dangerous nature of the viruses contained in such a lab, a leak could have devastating consequences.[9]

70.     Reports cannot be discounted that address that the purpose of the P4 lab, and the gain of function research of Dr. Shi and her team is really for bio-weapons research, and that the work on the SARS-CoV viruses had other applications.  Dr. Richard Enbright, a molecular biologist at Rutgers University in Piscataway, New Jersey, commenting in the 2017 article, said that such labs "are inherently dual use"[10]

71.     Despite denials that COVID-19 originated in the lab, reports and evidence are emerging that it did, including in a report from US intelligence.  As recently reported:

> The report, dated March 27 and corroborated by two U.S. officials, reveals that U.S. intelligence revised its January assessment in which it "judged that the outbreak probably occurred naturally" to now include the possibility that the new coronavirus emerged "accidentally" due to "unsafe laboratory practices" in the central Chinese city of Wuhan, where the pathogen was first observed late last year.
> . . .
> The Wuhan Institute has a record of shoddy practices that could conceivably lead to an accidental release, as officials at the U.S. Embassy in Beijing reportedly warned in a cable on January 19, 2018. "During interactions with scientists at the WIV laboratory, they noted the new lab has a serious shortage of appropriately trained technicians and investigators needed to safely operate this high-containment laboratory," states the cable, according to the Washington Post.[11]

72.     If WIV is the source, how the virus escaped has been variously attributed to their failure to adhere to proper containment protocols, and that the virus then escaped

---

[9]   David Cyranoski, *Inside the Chinese Lab Poised to Study World's Most Dangerous Pathogens*, Nature (Feb. 22, 2017) https://www.nature.com/news/inside-the-chinese-lab-poised-to-study-world-s-most-dangerous-pathogens-1.21487.
[10]  *Id.*
[11]  *The Controversial Experiments and Wuhan Lab Suspected of Starting the Coronavirus Pandemic*, Newsweek (Apr. 27, 2020), available at:  https://www.newsweek.com/controversial-wuhan-lab-experiments-that-may-have-started-coronavirus-pandemic-1500503.

because:  1) a post-doctoral researcher at the lab, Huang Yanling, became infected and was "patient zero" at some point in Fall 2019, and her existence has since been scrubbed;[12] 2) a lab researcher — in an apparently common and lucrative practice — sold research animals containing the virus to the Huanan Seafood Market in Wuhan (a researcher at WIV was recently jailed for the practice);[13] or 3) it escaped/leaked in some other intentional, reckless, or negligent way.

73.    Under the WIV theories, there is no consensus as yet whether it was one of the natural viruses in the bats stored there, or one of the synthetic (or partially synthetic) "gain of function" viruses that made it out of WIV, but in either case, it made its way into humans and began infecting the people of Wuhan.

74.    It was recognized internationally that having a level 4 lab in China was potentially dangerous because Chinese researchers would not be allowed to speak freely of safety issues in the CCP controlled country.  It was further recognized that China wanted the lab so it could compete with the U.S. and the west and be a destination for researchers and funding.[14]

75.    Defendants, knowing that the WIV labs did not abide by proper containment protocols, knowing they housed the most dangerous viruses, knowing they allowed

---

[12] Kenneth Rapoza, *China Lab In Focus Of Coronavirus Outbreak*, Forbes (Apr. 14, 2020), available at: https://www.forbes.com/sites/kenrapoza/2020/04/14/the-washington-post-goes-rogue-china-lab-in-focus-of-coronavirus-outbreak/#517b923a1ee1.

[13] Venus Upadhayaya, *Pandemic Reveals Alarming Absence of Ethics in China's Virology Labs: Experts*, Epoch Times (Apr. 25, 2020), available at: https://www.theepochtimes.com/pandemic-reveals-alarming-absence-of-ethics-in-chinas-virology-labs-experts_3320898.html.

[14] *See* David Cyranoski, *Inside the Chinese Lab Poised to Study World's Most Dangerous Pathogens*, Nature (Feb. 22, 2017).

dangerous "gain of function" manipulation of coronaviruses, allowed the work at WIV to continue for commercial gain, and the profit appetite of the Chinese Academy of Sciences.  Because of this, COVID-19 was allowed to escape into the general public.

### The Huanan Seafood Market Theory

76.     The second prevalent and alternative theory is that zoonotic transmission naturally occurred because of China's $75 billion annual trade in exotic animals, particularly in Southern China, both for medicinal and human consumption purposes.

77.     China claims to promote the conservation of exotic and endangered animals for conservation purposes, but there are many who claim that China uses conservation as a ruse to ensure exotic animals are traded and supplied to the "wet markets" such as Wuhan's Huanan Seafood Market.[15]

78.     Although it is called a "Seafood" market, it was known to sell all types of meats, poultry, fish and reptiles.[16]  And although bats and other exotic animals were not listed on its official inventory, it has been reported that such exotic animals could have easily been sold there unofficially and not listed because their trade is illegal.[17]  The hygienic conditions of the wet markets are generally described as appalling.

---

[15] Wilson Center presents: *Wild Laws: China and Its Role in Illicit Wildlife Trade*, June 2, 2016, available at https://www.wilsoncenter.org/event/wild-laws-china-and-its-role-illicit-wildlife-trade.  *See also*, Rachel Nuwer, *The Key to Stopping the Illegal Wildlife Trade: China*, New York Times (Nov. 19, 2018), available at: https://www.nytimes.com/2018/11/19/science/wildlife-trafficking-china.html.

[16] *As New Coronavirus Spread, China's Old Habits Delayed Fight,* New York Times (Feb. 1, 2020), available at https://www.nytimes.com/2020/02/01/world/asia/china-coronavirus.html.

[17] Graham Readfearn, *How Did Coronavirus Start and Where Did It Come From? Was It Really Wuhan's Animal Market?*, The Guardian (Apr. 27, 2020), available at: https://www.theguardian.com/world/2020/apr/28/how-did-the-coronavirus-start-where-did-it-come-from-how-did-it-spread-humans-was-it-really-bats-pangolins-wuhan-animal-market.

79.     The wet market theory hinges on natural transmission of the virus from animal to human, either directly from a bat, or through an intermediate host, such as a highly sought-after scaly anteater known as the Pangolin.  It has been called "the most illegally traded mammal in the world" and they are prized for their meat and the claimed medicinal properties of their scales.  The wet markets have been the source of prior SARS-coronavirus outbreaks.[18]

80.     Knowing the link between the wet markets and the virus outbreaks, the CCP and the Chinese Government Defendants promised the world in the mid 2000's that it would and had stopped the wet markets trade.  Although Defendants "officially" made such trade illegal, they did not stop it.  There is no doubt that these Defendants have the power and ability to stop it. They just chose to let it continue and participate in it themselves for economic gain, and because of that dangerous and abhorrent decision, a pandemic was unleashed on the world.

81.     But no matter which theory is true, Defendants are still culpable because of their active concealment of the virus outbreak, and their failure to contain it, at a time a pandemic could have been avoided.   And both theories spring from Defendants participating in commercial activities, that have now had a direct negative effect in the United States.

82.     It should be noted that in the November/December timeframe, China and the United States were negotiating a major trade deal, and that deal was signed with great

---

[18] *Id.*

fanfare on January 15, 2020.[19]  China signed the deal under false pretenses, because, upon signing, Defendants were already in violation of the clause that stated: "In the event that a natural disaster or other unforeseeable event outside the control of the Parties delays a Party from timely complying with its obligations under this Agreement, the Parties shall consult with each other."  China needed that deal because of the ongoing contraction of their GDP and uncertainty caused by the two countries' trade war, and it would likely have been derailed if they had been truthful about the virus.

83.  By January 15th, as explained *infra*, Defendants already knew that they had a deadly virus that easily passed human-to-human and that an epidemic could easily become a pandemic.  Given what has unfolded, Defendants' had a strong motive for concealing this information and letting the U.S. think everything was business as usual.

***Defendant's Active Concealment of the Dangers of COVID-19***

84.  After the first SARS epidemic in 2003, the PRC invested billions of dollars into an emergency reporting system known as the "Infectious Diseases and Public Health Emergencies Reporting System," which is run by the Chinese Center for Disease Control.[20]  In China, it is also known as the Surveillance Reporting System, or "SRS."[21]

---

[19] *Trump Signs China Trade Deal, Putting Economic Conflict on Pause*, New York Times (Jan. 15, 2020), available at:  https://www.nytimes.com/2020/01/15/business/ economy/china-trade-deal.html.
[20]  Chinese Center for Disease Control, "About Us – Public Health Surveillance and Information Services," http://www.chinacdc.cn/en/ (last accessed May 2, 2020).
[21] Dr. Wang Weiluo, *What Really Happened in the Early Days of the Virus Breakout*, at *2 (Apr. 28, 2020) (hereinafter "Dr. Wang Report").  Dr. Weilou is a Chinese born and educated scientist and researcher now based in Dortmund, Germany, and is well regarded by many Chinese for his extensive research into China's handling of environmental issues and the Three Gorges Dam project.  His report is currently being prepared for publication.

85.    The SRS is a high-tech reporting and data system where healthcare providers are supposed to report any unusual medical conditions affecting three or more patients, so that a response can be developed within hours.[22]

86.    The SRS failed here, because the Wuhan doctors and hospitals were forbidden from entering the information, and the doctor-controlled Chinese CDC was overridden by the CCP controlled WHC.[23]

87.    The first human infection from COVID-19/SARS-CoV-2 likely occurred in late 2019, but the exact date is still unknown.  Some reports claim that the first case became known on November 17, 2019, or possibly earlier.[24]

88.    The Lancet reported that the first patient contracted the virus on December 1, 2019, and had been associated with Huanan Seafood Market, and that man's wife began showing symptoms five days later, which indicated human-to-human transmission.[25]

89.    Dr. Gao Fu, director of China's CDC, received his PhD from Oxford (and is a visiting professor there), has done post-doctoral work at Harvard, and has published over 450 scientific papers in international medical journals.  According to Dr. Wang, frustration with the CCP led Dr. Fu to publish a report (co-authored by 52 other doctors and researchers) in the New England Journal of Medicine on January 29, 2020 that hid

---

[22]  Dr. Wang Report at *2-*6
[23]  *Id.*
[24]  *Coronavirus: China's First Confirmed Covid-19 Case Traced Back to November 17*, South China Morning Press (Mar. 13, 2020), available at: https://www.scmp.com/news/china/society/article/3074991/coronaviruschinas-first-confirmed-covid-19-case-traced-back.
[25]  *Clinical Features of Patients Infected with 2019 Novel Coronavirus In Wuhan, China*, The Lancet (Jan. 24, 2020), available at: https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30183-5/fulltext.

more true data about the outbreak and its early severity in plain sight.  That data revealed infections in Wuhan the first week of December, but even that data demonstrates underreporting because of the coverup by the WHC.[26]

90.    According to a study in the *Chinese Medical Journal*, laboratory testing was already being conducted on patients with COVID-19 symptoms between December 18 and 29, 2019, with symptoms attributed to "[a] novel bat-borne [coronavirus] … that is associated with severe and fatal respiratory disease in humans."[27]

91.    According to Chinese sources cited in the *National Review*, on December 25, 2019, "Chinese medical staff in two hospitals in Wuhan [were] suspected of contracting viral pneumonia and [were] quarantined[28]  Wuhan hospitals noticed an exponential rise in cases that could not be connected to the seafood market, all of which was additional strong evidence of human-to-human transmission.[29]  This was corroborated by the *Wall Street Journal*.[30]

92.    On December 27, 2019, HHC and WHC directed the Wuhan CDC to investigate infected patients at Hubei Xinhua Hospital in Wuhan.  As a result, most of these patients were moved to Wuhan's Gold-Silver Pond Hospital, which only handles

---

[26] Dr. Wang Report at *6-*7. *See also*, *Early Transmission Dynamics in Wuhan, China, of Novel Coronavirus–Infected Pneumonia*, N. Eng. J. of Med. (Jan. 29, 2020), available at https://www.nejm.org/doi/full/10.1056/NEJMoa2001316.

[27] *Identification of a Novel Coronavirus Causing Severe Pneumonia In Human: A Descriptive Study*," Chinese Medical Journal (Feb. 21, 2010), available at: https://journals.lww.com/cmj/Abstract/publishahead/Identification_of_a_novel _coronavirus_causing.99423.aspx.

[28] *Devastating Lies*, National Review (Mar. 23, 2020), available at: https://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.

[29] *Id.*

[30] *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal (Mar. 6, 2020), available at: https://www.wsj.com/articles/how-it-allstarted-chinas-early-coronavirus-missteps-11583508932.

infectious disease, another indication of the knowledge of the ease of human-to-human transmission and the virus's dangers.[31]

93.    According to the South China Morning Press, "On December 27, Zhang Jixian, a doctor from Hubei Provincial Hospital of Integrated Chinese and Western Medicine, told China's health authorities that the disease was caused by a new coronavirus.  By that date, more than 180 people had been infected, though doctors might not have been aware of all of them at the time."[32]

94.    A study of patients admitted through January 2 found that only 27 of 41 patients had a link to the Wuhan Seafood Market, indicating human-to-human transmission in December.[33]

95.    Thus, in December, Defendants knew that the virus was spreading easily human-to-human and that it was dangerous.

96.    Dr. Ai Fen, director of the ER at Wuhan Central Hospital was an early whistleblower who has been silenced.  The CCP has censored stories in China about her and she has reportedly now disappeared.  Although sources differ on the exact timing of the sequence, she was noticing the strange symptoms in patients by mid-December, and by December 30, 2019, had received a test result back indicating SARS coronavirus.  She

---

[31]  Dr. Wang Report at *10.

[32]  *Coronavirus: China's First Confirmed Covid-19 Case Traced Back to November 17*, South China Morning Press (Mar. 13, 2020), available at: https://www.scmp.com/ news/china/society/article/3074991/coronavirus-    chinas-first-confirmed-covid-19-case-traced-back.

[33]  *Clinical Features of Patients Infected with 2019 Novel Coronavirus In Wuhan, China*, The Lancet (January 24, 2020), available at: https://www.thelancet.com/journals/lancet/ article/PIIS0140-6736(20)30183- 5/fulltext.

circled the word SARS and sent a picture to colleagues to warn them, one of whom was Dr. Li Wenliang, a former classmate.[34]

97.     According to CNN, on December 30, 2019, Dr. Li, using the popular chat application WeChat, repeated this information to his medical school alumni group about patients at his hospital suffering from a SARS-like illness that may have originated from a coronavirus.[35]

98.     In his messages, Dr. Li shared details of what would be named COVID-19, urging them to take precautions against the risk of human-to-human transmission.[36]

99.     On December 30, 2019, WHC released a notice to medical institutions that patients visiting the Wuhan Seafood Market had contracted a pneumonia-like illness.  The notice warned medical professionals: "Any organizations or individuals are not allowed to release treatment information to the public without authorization." [37]  Dr. Wang has obtained copies of these notices.[38]  (Attached as Composite **Exhibit A**).

100.     Within hours of sending his warning to colleagues via WeChat on December 30, screenshots of Dr. Li Wenliang's message had been shared widely on social media, but government censors then took action to stop the circulation.[39]

---

[34] *Coronavirus: Wuhan Doctor Speaks Out Against Authorities*, The Guardian (Mar. 11, 2020), available at https://www.theguardian.com/world/2020/mar/11/coronavirus-wuhan-doctor-ai-fen-speaks-out-against-authorities.  *See also* Dr. Ai Fen, Wikipedia, https://en.wikipedia.org/wiki/Ai_Fen.

[35] *This Chinese Doctor Tried to Save Lives, But Was Silenced. Now He Has Coronavirus*, CNN (Feb. 4, 2020), available at: https://www.cnn.com/2020/02/03/asia/coronavirus-doctor-whistle-blower-intl-hnk/index.html.

[36] *Id.*

[37] *Id.*

[38] Dr. Wang Report at *4-*5.

[39] *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal (Mar. 6, 2020), *supra*.

101.    Later that night, at 1:30am on December 31, Dr. Li was summoned to WHC for questioning, and later that same day, Dr. Li was summoned by his hospital head, who demanded that he admit his wrongdoing.[40]

102.    By December 30, Dr. Gao had found out about the unreported infections in Wuhan and that they were not in the SRS.  He summoned top CDC and NHC leaders to meet in Wuhan with the WHC and HHC on the morning of December 31, 2019.  It was decided at this meeting that all information would be controlled by WHC.[41]  Thus, the multi-billion dollar SRS that could have alerted Wuhan's residents and the world, was put aside in favor of fear and silence, with a tightly controlled, but ineffective, internal reporting only system, controlled by CCP leaders.

103.    Despite the previously-mentioned evidence to the contrary, on December 31, 2020, WHC declared, "[t]he medical staff investigation so far has not found any obvious human-to-human transmission and no infection."[42]

104.    On December 31, the YY online social network platform (one of China's most popular social networks) listed 45 words as forbidden search terms including: "Unknown pneumonia in Wuhan", "Wuhan seafood market", "SARS", "outbreak of SARS epidemic", "WHC", and "P4 Viral Lab."[43]  That same day, researchers at the University of Toronto took notice of this and other censoring of key words about the virus on Chinese social media platforms.[44]

---

[40]  Dr. Wang Report at *11.
[41]  *Id.* at *6.
[42]  *Devastating Lies*, National Review (Mar. 23, 2020), *supra.*
[43]  Dr. Wang Report at *11.
[44]  *Censored Contagion: How Information on the Coronavirus is Managed on Chinese Social Media*, U. of Toronto, The Citizen Lab (Mar. 3, 2020), available at

105.     Besides YY, another censored platform was WeChat, and as explained by the researchers, WeChat "has become increasingly popular among [Chinese] doctors who use it to obtain professional knowledge from peers. Because of social media's integral role in Chinese society and its uptake by the Chinese medical community, systematic blocking of general communication on social media related to disease information and prevention risks substantially harming the ability of the public to share information that may be essential to their health and safety."[45]

106.     On January 1, Defendants censored eight doctors from speaking about the outbreak and its dangers.  The Wuhan police stated that they had "taken legal measures" against eight people who "published and shared rumors online," and one of them was Dr. Wenliang.[46]

107.     According to CNN, "The police announcement [against the eight people] was broadcast across the country on CCTV, China's state broadcaster, making it clear how the Chinese government would treat such 'rumormongers.'"[47]

108.     The message reportedly said, "The internet is not a land beyond the law ... Any unlawful acts of fabricating, spreading rumors and disturbing the social order will be punished by police according to the law, with zero tolerance."[48]

109.     As described by the St. Louis Post-Dispatch, "The punishment of eight doctors for 'rumor-mongering,' broadcast on national television on January 2, sent a chill

---

https://citizenlab.ca/2020/03/censored-contagion-how-information-on-the-coronavirus-is-managed-on-chinese-social-media/.
[45] *Id.*
[46] *Id.  See also, This Chinese Doctor Tried to Save Lives, But Was Silenced. Now He Has Coronavirus*, CNN (Feb. 4, 2020) *supra*.
[47] *Id.*
[48] *Id.*

through the city's hospitals," and suppressed information from reaching the rest of the world.[49]

110.    On January 1, 2020, "after several batches of genome sequence results had been returned to hospitals and submitted to health authorities, an employee of one genomics company received a phone call from an official at the HHC, ordering the company to stop testing samples from Wuhan related to the new disease and destroy all existing samples."[50]

111.    Dr. Ai, as of January 1, 2020,  ordered her staff to put on masks, suspecting the ease of human-to-human transmission.[51]

112.    But that night, "the hospital's discipline department summoned her for a chat the next day. She was criticized for 'spreading rumors,' according to Dr. Ai. She tried to argue that the disease could be contagious. They said her action caused panic and 'damaged the stability' of Wuhan. The hospital's leadership also banned staff from discussing the disease in public or via texts or images."[52]

113.    On January 2, 2020, Dr. Shi Zhengli and her colleagues at the WIV

---

[49] *Six Days Of Silence When China Didn't Warn Public of Likely Pandemic*, The St. Louis Post Dispatch, (Apr. 16, 2020), available at: https://www.stltoday.com/news/ national/your-daily-6-nurses-suspended-over- *Six days of silence when China didn't warn public of likely pandemic*, The St. Louis Post Dispatch, (Apr. 16, 2020), available at: https://www.stltoday.com/news/  national/your-daily-6-nurses-suspended-over-  masks-cheaper-iphone-and-how-six-days-of-silence/collection_a2b87190-132f-     5438-a36d-1c48c64be013.html#1

[50] *How Early Signs of The Coronavirus Were Spotted, Spread and Throttled In China*, The Strait Times (Feb. 28, 2020), available at: https://www.straitstimes.com/asia/east-asia/how-early-signs-of-the- coronavirus-were-spotted-spread-and-throttled-in-china

[51] *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal (Mar. 6, 2020), *supra*.

[52] *Id.*

completed the genome sequencing of the virus.[53]   Discovery of the genome sequence

was not announced at the time.[54]   The dean of the WIV reminded the staff of the WHC

order that no one could disclose any of the information.[55]  (Composite **Exhibit B**).

114.   On January 3, 2020, Dr. Li Wenliang was forced to confess to a

misdemeanor, prepare a self-criticism, and agree not to commit any additional "unlawful

acts."[56]

115.   The confession that Dr. Li was forced to sign demonstrates the lengths that

Defendants would go to intimidate and ensure silence about the truth.   The confession

stated that:

> Your action has severely disrupted the order of society.  Your action has
> breached the law, violating the relevant rules in the "Law of the People's
> Republic of China on Penalties for Administration of Public Security."  It is
> an illegal act!
> . . .
> We want you to calm down and reflect on your actions, as well as solemnly
> warn you:  If you insist on your views, refuse to repent and continue the
> illegal activity, you will be punished by the law.  Do you understand?
>
> Answer:  I understand. (Composite **Exhibit C**).[57]

In other words, if you tell the truth about a dangerous epidemic that will easily pass

human-to-human and cause the death of many, you will be severely punished.

116.   The directors of the Central Hospital of Wuhan, where both Dr. Li Wenliang

and Dr. Ai Fen worked,  urgently called a meeting that evening for all departmental

---

[53] *Id. See also, As New Coronavirus Spread, China's Old Habits Delayed Fight,* New
York Times (Feb. 1, 2020), *supra.*
[54] The Strait Times, *supra.*
[55] Dr. Wang Report at *12.
[56] *This Chinese Doctor Tried to Save Lives, But Was Silenced. Now He Has Coronavirus*,
CNN (Feb. 4, 2020), *supra.*
[57] Before Dr. Li's untimely death from coronavirus, he posted the confession on his social
media account at Weibo.

directors and stressed that they should follow the WHC rules of silence and not leak out any information.[58]

117.    On January 3, 2020, "China's National Health Commission (NHC), the nation's top health authority, ordered institutions not to publish any information related to the unknown disease, and ordered labs to transfer any samples they had to designated testing institutions, or to destroy them."[59]  The NHC notice categorized viral samples as "Class 2 of Highly Pathogenic Microorganisms."[60]  Again, Defendants knew how dangerous the virus was and destroyed test results, suppressed all public information, and lied in the information they did provide to the outside world.

118.    The *National Review*, quoting Chinese sources, stated that on January 3, the "Wuhan Municipal Health Commission released another statement, repeating, 'As of now, preliminary investigations have shown no clear evidence of human-to-human transmission and no medical staff infections.'"[61]

59.    The World Health Organization ("WHO") had been informed (too late) of events in Wuhan on December 31, with the organization saying that "the WHO China Country Office was informed of cases of pneumonia unknown etiology (unknown cause) detected in Wuhan City, Hubei Province of China."[62]

60.    On information and belief, part of the Defendants' coverup involved

---

[58]  Dr. Wang Report at *12.
[59]  *How Early Signs of The Coronavirus Were Spotted, Spread and Throttled In China*, The Strait Times (Feb. 28, 2020), *supra.*
[60]  Dr. Wang Report at *12.
[61]  *Devastating Lies*, National Review (Mar. 23, 2020), *supra.*
[62]  *Novel Coronavirus (2019-nCoV) SITUATION REPORT – 1*, World Health Organization (Jan. 21, 2020), available at: https://www.who.int/docs/default-source/coronaviruse/ situation- reports/20200121-sitrep-1-2019-ncov.pdf.

misleading the WHO, an international organization under the United Nations whose objective is "the attainment by all peoples of the highest possible level of health," according to its Constitution.[63]

61.     On information and belief, the Chinese Government Defendants delayed reporting COVID-19 to the WHO for weeks after the outbreak was identified in the Chinese medical community.

119.    Under Article 6.1 of the International Health Regulations, China had a duty to report "all events which may constitute a public health emergency of international concern within its territory" within 24 hours.

120.    When China did inform the WHO of the disease, Chinese authorities denied human-to-human transmission, despite having significant evidence to the contrary. On information and belief, Defendants' denial induced the WHO to also deny or downplay the risk of human-to-human transmission in the critical weeks while the virus was first spreading.

121.    According to the *Wall Street Journal*, on January 5, "a medical research center in Shanghai notified the National Health Commission that one of its professors had also identified a SARS-like coronavirus and mapped the entire genome using a sample from Wuhan."[64]

122.    Like the genome discovery by WIV on January 2, the January 5 genome mapping was kept secret.[65]

---

[63]  World Health Organization Constitution, Article I, available at: https://apps.who.int/gb/bd/PDF/bd47/EN/constitution-en.pdf?ua=1.
[64]  *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal (Mar. 6, 2020), *supra.*
[65]  *Id.*

123.    On January 5, 2020, relying on information from Chinese officials, WHO released a statement saying, "Based on the preliminary information from the Chinese investigation team, *no evidence of significant human-to-human transmission and no health care worker infections have been reported*."[66]

124.    On January 6, the United States Centers for Disease Control offered to send a research team to assist Defendants, but Defendants did not extend permission to enter the country.[67]

125.    On January 8, 2020, WHO, relying on information from Chinese officials, said, "WHO does not recommend any specific measures for travelers. WHO advises against the application of any travel or trade restrictions on China based on the information currently available."[68]

126.    Various sources theorize that WHO was also silent (or proverbially stuck its head in the sand) because China exercises so much control over its governance and funding.

127.    Chinese authorities, including Defendants, did not publicly confirm the outbreak as originating from a novel coronavirus until January 9, 2020, despite having a

---

[66] *Pneumonia of Unknown Cause – China*, WHO Disease Outbreak News (Jan. 5, 2020) (emphasis supplied), available at: https://www.who.int/csr/don/05-january-2020-pneumonia-of-unkown-cause-china/en/.

[67] *Exclusive: U.S. Axed CDC Expert Job In China Months Before Virus Outbreak*, Reuters (Mar. 22, 2020), available at: https://www.reuters.com/article/us-health-coronavirus-china-cdc-    exclusiv/exclusive-u-s-axed-cdc-expert-job-in-china-months-before-virus-outbreak-idUSKBN21910S.

[68] *WHO Statement Regarding Cluster of Pneumonia Cases In Wuhan, China*, WHO (Jan. 9, 2020), available at: https://www.who.int/china/news/detail/09- 01-2020-who-statement-regarding-cluster-of-pneumonia-cases-in-wuhan- china.

mapping of its genome and other details showing that it was a new virus.[69]

128.    On January 10, the New York Times attributed to WHC a statement that "[t]here is no evidence that the virus can be spread between humans."[70]

129.    According to the National Review, citing Chinese sources, on January 11, the Wuhan City Health Commission issued a statement saying, "All 739 close contacts, including 419 medical staff, have undergone medical observation and no related cases have been found . . . No new cases have been detected since January 3, 2020. At present, no medical staff infections have been found, and no clear evidence of human-to-human transmission has been found."[71]  This statement directly contradicted then-existing evidence.

130.    Chinese authorities, including Defendants, did not share the genome sequence which the Wall Street Journal described as a "critical step[] toward containing the epidemic and designing a vaccine" with the international community until January 12.[72]

131.    The first case outside of China was reported in Thailand on January 13.[73]

132.    Following the Thai case, Defendants still did not tell the public about the new evidence directly confirming human-to-human transmission.[74]

---

[69] *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal (Mar. 6, 2020), *supra.*

[70] *China Reports First Death From New Virus*, New York Times (Jan. 10, 2010), available at:   https://www.nytimes.com/2020/01/10/world/asia/china-   virus-wuhan-death.html ?searchResultPosition=9.

[71] *Devastating Lies*, National Review (Mar. 23, 2020), *supra.*

[72] *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal (Mar. 6, 2020), *supra.*

[73] *Six Days of Silence When China Didn't Warn Public of Likely Pandemic*, The St. Louis Post Dispatch, (Apr. 16, 2020), *supra.*

[74] *Id.*

133.    For instance, PRC and CCP officials continued denying human-to-human transmission and failed to inform the public, despite overwhelming evidence of the virus's contagiousness.[75]

134.    According to the National Review, citing Chinese sources, on January 14, the Wuhan City Health Commission issued another statement saying, "Among the close contacts, no related cases were found."[76]

135.    According to the Wall Street Journal, when President and General Secretary Xi Jinping, leader of the PRC and CCP, made "his first public statement on the crisis on January 20, he made no explicit mention of human- to-human transmission."[77]

136.    By the time President Xi made his statement, millions of travelers passed through Wuhan, and "more than 3,000 people had been infected during almost a week of public silence, according to internal documents obtained by The Associated Press and expert estimates based on retrospective infection data."[78]

137.    WHC continued publicly to deny human-to-human transmission until January 20,[79] at which point Chinese authorities finally confirmed for the first time that human-to-human transmission was occurring.[80]

138.    On January 20 and 21, 2020, the WHO was able to conduct a mission on

---

[75] *Id.*

[76] *Devastating Lies*, National Review (Mar. 23, 2020), *supra.*

[77] *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal (Mar. 6, 2020), *supra*.

[78] *Six Days of Silence When China Didn't Warn Public of Likely Pandemic*, The St. Louis Post Dispatch, (Apr. 16, 2020), *supra.*

[79] *Id.*

[80] *China confirms human-to-human transmission of coronavirus*, The Guardian (January 20, 2020), available at:      https://www.theguardian.com/world/2020/jan/20/coronavirus-spreads-to- beijing-as-china-confirms-new-cases.

the ground in China and said afterward, "Data collected through detailed epidemiological investigation and through the deployment of the new test kit nationally suggests that human-to-human transmission is taking place in Wuhan.   More analysis of the epidemiological data is needed to understand the full extent of human-to-human transmission."[81]

139.   On January 23, 2020, China began its first steps towards quarantining Wuhan residents.

140.   Weeks after the lockdown slowed cases in Wuhan, China continued to mislead the world about its knowledge of the nature of the virus, and on April 17, 2020, it upwardly revised the death toll in Wuhan by more than a thousand cases, attributing the error to "incorrect reporting, delays and omissions."[82]

141.   It is widely believed that even with the adjustment, Defendants are still woefully underreporting the actual number of cases and deaths in Wuhan, especially in December 2019 and early January 2020, as well as other key statistics of COVID-19.

142.   Chinese citizen journalists, who posted videos from Wuhan of overcrowded hospitals and other scenes from the COVID-19 pandemic, have gone missing in recent weeks.[83]

---

[81] *Mission summary: WHO Field Visit to Wuhan, China 20-21 January 2020*, WHO (Jan. 22, 2020), available at: https://www.who.int/china/news/detail/22- 01-2020-field-visit-wuhan-china-jan-2020.

[82] *China Raises Wuhan Death Stats By Half To Account For Reporting Delays And Omissions*, National Public Radio (Apr. 17, 2020), available at: ww.npr.org/sections/coronavirus-live- updates/2020/04/17/836700806/china-raises-wuhan-death-stats-by-half-to-account-for-reporting-delays-and-omiss.

[83] *2 Wuhan Whistleblowers Missing Months After Helping Expose Coronavirus Outbreak, Activists Say*, Fox News (Apr. 15, 2020), available at: https://www.foxnews.com/world/wuhan-whistleblowers-missing-exposing- coronavirus.

143.    China has launched a "massive public relations campaign to avoid blame for the COVID-19 pandemic" and has spread conspiracy theories that the U.S. military had spread the virus.[84]

**Defendants Failed to Contain the Virus, and Helped It Spread**

144.    According to data gathered by the *New York Times*, approximately 175,000 individuals left Wuhan on January 1 alone to travel for the Lunar New Year.[85]

145.    As stated by the New York Times, because of the Lunar New Year travel, "[t]he timing of the outbreak could not have been worse."[86]

146.    According to the *Wall Street Journal*, China "went ahead with New Year celebrations despite the risk of wider infections" and let "some five million people leave Wuhan without screening."[87]   Many of these travelers went not only to other parts of China, but spread out across the globe.   Flights from Wuhan fly direct to over 21 international destinations including U.S. cities such as New York, San Francisco, and Los Angeles.

147.    The Chinese CDC knew of the epidemic in Wuhan by New Year's Eve, but the WHC was controlling all information, and 200,000 Wuhan residents and tourists were allowed to gather for the Yangtze River Light Show that evening.[88]   The Yangtze flows

---

[84]   *Guest on Chinese-produced Arabic-language program claimed US may be to blame for coronavirus pandemic*, Fox News (Apr. 19, 2020), available at: https://www.foxnews.com/world/chinese-arabic-language-program-us-     coronavirus-pandemic.
[85]   *How the Virus Got Out*, New York Times (Mar. 22, 2020), available at: https://www.nytimes.com/interactive/2020/03/22/world/coronavirus- spread.html?action= click&module=Spotlight&pgtype=Homepage.
[86]   *Id.*
[87]   *How It All Started: China's Early Coronavirus Missteps*, The Wall Street Journal (Mar. 6, 2020), *supra*.
[88]   Dr. Wang Report at *11.

through the center of Wuhan.

148.     An annual Lunar Year Potluck Banquet was allowed to proceed in a Wuhan neighborhood on January 18, attracting 40,000 families.[89]

149.     Wuhan's mayor later told Chinese Television that he and his government could not do or say more about the epidemic until he was authorized by the State Council (CCP) after January 20, many weeks after he knew there was a dangerous problem in his city.[90]

150.     On January 20, a government linked doctor dispatched by Beijing to Wuhan finally admitted human-to-human transmission and that medical workers were becoming sick.  It was then announced that Wuhan would shut down on the morning of January 23, creating a mass exodus out of Wuhan of surely infected people.[91]

151.     Defendants allowed these massive public gatherings and the massive exodus from Wuhan despite knowing the risks of COVID-19, including the risk of human-to-human transmission, and the virus's dangerous propensities.

152.     In short, Defendants' conduct as described above has been egregious and clearly contrary to the precepts of humanity; was prohibited by the internal laws of the PRC and its provincial and municipal governments;  and Defendants failed to warn the world of the dangers when it had a very early opportunity to do so.

153.     Moreover, Defendants' conduct as to their active concealment and failure to warn were intentional, reckless, grossly negligent, and/or negligent.

---

[89]  *Devastating Lie*s, National Review (Mar. 23, 2020), *supra*.
[90]  Dr. Wang Report at *8.
[91]  *As New Coronavirus Spread, China's Old Habits Delayed Fight,* New York Times (Feb. 1, 2020), *supra*.

154.    The number of cases and deaths continues to rise around the world and particularly in the United States.  Millions of Americans are now jobless, and businesses are suffering tremendous economic impacts, as is the U.S. economy.

155.    Because of Defendant's conduct, as described herein, individual Named Plaintiffs and Class Members have or are virtually certain to suffer physical illness or death, as well as emotional distress, and its physical manifestations, from the effects of the outbreak, and other damages.

156.    Because of Defendant's conduct, as described herein, Named Plaintiffs who are independent contractors or business owners have or are virtually certain to suffer injury and damages from the effects of the outbreak.

157.    This pandemic is likely to injure a substantial majority of all persons and entities within the United States and the State of Florida.

158.    The personal injuries being sustained are universal and not linked to individualized factors.

159.    Any condition precedent to the filing of this lawsuit has been satisfied, met, and/or waived.

**CLASS ACTION ALLEGTIONS**

160.    The Named Plaintiffs with claims against Defendants assert the following National and Florida Classes pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and those similarly situated, against the Defendants for whom they have standing.

a.  All Named Plaintiffs who have suffered personal injury and/or property damage

comprise the National <u>Non-Commercial Tort Class</u> and related Florida Sub-

Class, and these classes are described as follows:

National:  All persons and legal entities in the United States who have
suffered personal injury, including emotional distress, and/or property
damage, and other loss related to the outbreak of the COVID-19 virus.

Florida:  All persons and legal entities in the State of Florida who have
suffered personal injury, including emotional distress, and/or property
damage, and other loss related to the outbreak of the COVID-19 virus.

b.  All Named Plaintiffs who have suffered economic losses comprise the National

<u>Commercial Activity Class</u> and related Florida Sub-Class, and these classes

are described as follows:

National:  All persons and legal entities in the United States who have
suffered economic losses due to the outbreak of the COVID-19 virus.

Florida:  All persons and legal entities in the State of Florida who have
suffered economic losses due to the outbreak of the COVID-19 virus.

c.  Plaintiffs TODD KUNTZE, SAUNDRA ANDRINGA-MEUER, and JESSICA

MERRITT represent the National <u>"Diagnosed" Class</u>, and TODD KUNTZE and

JESSICA MERRITT also represents a related Florida Sub-Class, and these

classes are described as follows:

National:   All individuals in the United States who have contracted
COVID-19 and have suffered personal injuries and losses as a result.

Florida:   All individuals in the State of Florida who have contracted
COVID-19 and have suffered personal injuries and losses as a result.

d.  Plaintiffs JOHN VECCHIARELLO, LINDA IGLESIAS, CONSTANCE GREENE,

and  BRYAN EADS  represent  the  National <u>"Direct Exposure" Class</u>, and

CONSTANCE GREENE also represents a related Florida Sub-Class, and these classes are described as follows:

National:  All natural persons in the United States who have been directly exposed to COVID-19 because of family or household members who contracted the virus, and/or because of their work environment, and have suffered harm, injuries and losses as a result.

Florida:  All natural persons in the State of Florida who have been directly exposed to COVID-19 because of family or household members who contracted the virus, and/or because of their work environment, and have suffered harm, injuries and losses as a result.

e.  Plaintiffs JENNIFER MITCHELL, as Personal Representative of the Estate of James Mitchell, LORRAINE CAGGIANO MAIORINO, RAY BODINE, and GEORGE ROGOZINSKI, represent the National <u>"Wrongful Death/Survivors" Class</u>, and JENNIFER MITCHELL also represents a related Florida Sub-Class, and these classes are described as follows:

National:  All natural persons in the United States whose family member(s) have died leaving a claim for wrongful death/survivorship, due to COVID-19.

Florida:  All natural persons in the State of Florida whose family member(s) have died leaving a claim for wrongful death/survivorship, due to COVID-19.

f.  Plaintiffs JENNIFER MITCHELL (individually), KIMBERLY ELLER, and SHERRY WERNER, represent the National <u>"Emotional Distress" Class</u>, and JENNIFER MITCHELL (individually) also represents a related Florida Sub-Class, and these classes are described as follows:

National:  All natural persons in the United States who have suffered severe emotional distress and related harms, injuries, losses, as a result of the effects of the COVID-19 pandemic.

Florida:  All natural persons in the State of Florida who have suffered severe emotional distress and related harms, injuries, losses, as a result of the effects of the COVID-19 pandemic.

g.  Plaintiffs MARTA REYES, STEPHEN CLYNE, WILLIAM DAMELIO, and JUDY

HART, represent the National "Personal Economic Loss" Class, and MARTA

REYES, STEPHEN CLYNE, and WILLIAM DAMELIO also represent a related

Florida Sub-Class, and these classes are described as follows:

National:  All natural persons in the United States who have suffered personal economic loss from the financial impact and/or job losses associated with the effects of the COVID-19 pandemic on the economy.

Florida:  All natural persons in the State of Florida who have suffered personal economic loss from the financial impact and/or job losses associated with the effects of the COVID-19 pandemic on the economy.

h.  Plaintiffs SB HOLDINGS I, LLC and ROBERT JARVIS, represent the National

"Hotel/Lodging Industry" Class and related Florida Sub-Class, and these

classes are described as follows:

National:  All persons and legal entities in the United States who own hotels, motels, and other travel accommodations facilities, who have suffered economic losses due to the effects of the COVID-19 pandemic on the economy and travel industry.

Florida:  All persons and legal entities in the State of Florida who own hotels, motels, and other travel accommodations facilities, who have suffered economic losses due to the effects of the COVID-19 pandemic on the economy and travel industry.

i.  Plaintiffs SEAGRASS RESORT, LLC and BILL MCCUTCHEON, represent the

National "General Tourism Industry" Class, and SEAGRASS RESORT, LLC

also represents a related Florida Sub-Class, and these classes are described

as follows:

National:  All persons and legal entities in the United States who own businesses that rely on travel and tourism — other than hotels, motels, and

other travel accommodations facilities — and who have suffered economic losses due to the effects of the COVID-19 pandemic on the economy and travel industry.

Florida:   All persons and legal entities in the State of Florida who own businesses that rely on travel and tourism — other than hotels, motels, and other travel accommodations facilities — and who have suffered economic losses due to the effects of the COVID-19 pandemic on the economy and travel industry.

j.   Plaintiffs THE PITCHING LAB LLC d/b/a TBT Training and DR. ANDREW

NEWMAN, represent the National "Service Business" Class, and THE

PITCHING LAB LLC d/b/a TBT Training also represents a related Florida Sub-

Class, and these classes are described as follows:

National:   All persons and legal entities in the United States who own businesses that primarily provide individual services and retail to the general public, including, but not limited to, gyms, barber, hair, and nail salons, spas, and medical offices, who have suffered economic losses due to the effects of the COVID-19 pandemic on the economy and the shutdown of such businesses.

Florida:   All persons and legal entities in the State of Florida who own businesses that primarily provide individual services and retail to the general public, including, but not limited to, gyms, barber, hair, and nail salons, spas, and medical offices, who have suffered economic losses due to the effects of the COVID-19 pandemic on the economy and the shutdown of such businesses.

k.   Plaintiffs MR. M'S SANDWICH SHOP, INC. and JUPITER DONUTS, represent

the National "Restaurant and Bar Business" Class and a related Florida Sub-

Class, and these classes are described as follows:

National:   All persons and legal entities in the United States who own restaurant, bar, fast food, and other dine-in/take-out businesses that have suffered economic losses due to the effects of the COVID-19 pandemic on the economy and the shutdown/limitation of such businesses.

Florida:   All persons and legal entities in the State of Florida who own restaurant, bar, fast food, and other dine-in/take-out businesses that have

suffered economic losses due to the effects of the COVID-19 pandemic on the economy and the shutdown/limitation of such businesses.

l.   Plaintiffs JOHN VECCHIARELLO, LAWRENCE WOOD, GALLERY ART GROUP, INC., SOUTH FLORIDA SURFING CORP. d/b/a ISLAND WATER SPORTS MIAMI, SAMSON TOURS INC., and EAST AIR CORPORATION represent the National "General Business" Class, and LAWRENCE WOOD, GALLERY ART GROUP, INC., SOUTH FLORIDA SURFING CORP. d/b/a ISLAND WATER SPORTS MIAMI represent a related Florida Sub-Class, and these classes are described as follows:

National:  All persons and legal entities in the United States who own general businesses, including retail businesses — that are unrelated to tavel/tourism, services businesses, and restaurant/bar/fast-food — and that have suffered economic losses due to the effects of the COVID-19 pandemic on the economy and the shutdown/limitation of such businesses.

Florida:  All persons and legal entities in the State of Florida who own general businesses, including retail businesses — that are unrelated to tavel/tourism, services businesses, and restaurant/bar/fast-food — and that have suffered economic losses due to the effects of the COVID-19 pandemic on the economy and the shutdown/limitation of such businesses.

m.   Plaintiffs ROBERT SHAFFER and KARL UMBACH, represent the National "Farming, Livestock and Agriculture" Class, which is described as follows:

National:  All persons and legal entities in the United States who own farming, livestock, and agriculture related businesses that have suffered economic losses due to the effects of the COVID-19 pandemic on the economy and the shutdown/limitation of such businesses.

161.   Excluded from the Classes are the following: (1) the Defendants, and any parent, subsidiary or affiliate organizations, and the officers, directors, agents, servants, or employees of same, and the members of the immediate family of any such person; (2) all persons and entities who timely opt out of this proceeding; (3) all persons who have

given valid releases releasing Defendants from the claims asserted in this Complaint; (4) all persons who, prior to the filing of this Complaint, have filed a non-class action claim against the Defendants (or any of them) for the claims asserted in this Complaint; and (5) the judge(s) to whom this case is assigned, their employees and clerks, and immediate family members.

162.   The Classes are sufficiently numerous such that the joinder of all members of the Classes in a single action is impracticable.  The population of the United States is over 327,000,000 and the population of Florida is over 21,000,000 and a substantial majority of those persons and related entities have been or will in the immediate future be affected by Defendants' wrongful conduct, and fall under one of the listed classes.

163.   There are numerous common questions of law and fact that predominate over any questions affecting only individual members of the Classes and/or Subclasses. Among these common questions of law and fact are the following:

    a.  Whether Defendants' actions or failures to act were intentional, grossly negligent, negligent, and/or reckless;

    b.  Whether Defendant's actions or failures to act were clearly contrary to the precepts of humanity;

    c.  Whether Defendants' actions or failures to act violated established laws within the PRC;

    d.  Whether Defendants' knew of and failed to warn of a danger;

    e.  Whether the WIV's research into pathogens and coronaviruses is an ultrahazardous activity;

    f.  Whether WIV's actions or failures to act caused the release of the virus; and

    g.  Whether the virus originated from the Huanan Seafood Market or in another way.

164.    The claims of the Named Plaintiffs are typical of the claims of each member of the Classes and Sub-Classes in that, among other issues:

a. The Named Plaintiffs' claims arise from the same course of conduct of Defendants giving rise to the claims of other Class Members;

b. The claims of the Named Plaintiffs and each member of the Class are based upon the same legal theories;

c. The Named Plaintiffs and each member of the Classes have an interest in prevailing on the same legal claims;

d. The types of damages incurred by the Named Plaintiffs are similar to those incurred by the other Class Members;

e. The defenses asserted by Defendants will be very similar, if not identical, as to all Named Plaintiffs and Class Members.

165.    Named Plaintiffs are adequate representatives of the Classes in which they participate because, together with their legal counsel, each will fairly and adequately protect the interests of Classes. Named Plaintiffs and all Class Members have a similar, if not identical interest in obtaining the relief sought.  Proof of the claims of the Named Plaintiffs will also prove the claims of the Class.  Named Plaintiffs are not subject to any unique defenses.  Named Plaintiffs have no known conflict with the Class or Subclasses and are committed to the vigorous prosecution of this action.

166.    The undersigned counsel are competent counsel experienced in class action litigation, mass torts, and complex litigation involving such widespread harm. Counsel will fairly and adequately protect the interests of the Classes

167.    The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish

incompatible standards of conduct for the party opposing the Classes; or adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other Class Members who are not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

168.    Any claim for injunctive relief in this case that are certifiable under Fed. R. Civ. P. 23(b)(2) are proper because Defendants have acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief and/or declaratory relief is appropriate respecting the Classes as a whole.

169.    Plaintiffs' legal claims are properly certified pursuant to Rule 23(b)(3) in that: (1) a class action is superior in this case to other methods of dispute resolution; (2) the Class Members have an interest in class adjudication rather than individual adjudication because of their overlapping rights; (3) it is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class Members would protect their rights on their own without this class action case; (4)  the disparity between the resources of Defendants and Class Members would make prosecution of individual actions a financial hardship on Class Members; (5) the prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members is impractical and would create a massive and unnecessary burden on the Court's resources; and (6) Management of the class will be efficient and far superior to the management of individual lawsuits.  Moreover, currently, the undersigned counsel is unaware of any other pending litigation regarding this controversy with respect to the claims asserted here.

170.   The issues particularly common to the Class Members' claims, some of which are identified above, are alternatively certifiable pursuant to Fed. R. Civ. P. 23(c)(4), as resolution of these issues would materially advance the litigation, and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

171.   Named Plaintiffs have retained the above counsel to represent them in this lawsuit, and are obligated to pay said counsel reasonable attorneys' fees provided recovery is obtained.

## COUNT I – NEGLIGENCE
(Named Plaintiffs and each Class and Sub-Class; Against all Defendants)

172.   Named Plaintiffs adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 171, as if fully set forth herein, and further allege:

173.   Defendants had a duty to persons in the United States, including Named Plaintiffs and the members of the classes, to not act negligently in their handling of the COVID-19 outbreak, such that COVID-19 did not spread as it did.

174.   Defendants breached their duty to Plaintiffs and the members of the classes, by, among other breaches:

   a.   Failure to admit their knowledge of the dangers of the virus, its lethalness, and the ease of human-to-human transmission;

   b.   Failure to contain the virus in its early stages when they knew or should have known of its dangers and ease of transmission;

   c.   Failure to contain the virus more quickly when the spread was apparent;

   d.   Failure to restrict mass public gathering and travel from Wuhan when they knew or should have known of the dangers of the virus and ease of transmission;

   e.   Failure of the governmental entities to adequately and reasonably supervise the outbreak and contain its effects;

f.  Failure to provide adequate and reasonable warning to Named Plaintiffs and members of the classes when they knew or should have known of the dangers described herein; and

g.  Dissemination of materials and statements that provided the wrong information to people within and outside China.

175.  As a direct and proximate result of Defendants' breaches as described herein, Named Plaintiffs and the members of the classes have been injured and harmed, and have suffered damages and economic harms, and seek actual, special, and compensatory damages.

**COUNT II – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
(Named Plaintiffs and Class Members Who Are Natural Persons;
Against all Defendants)

176.  Named Plaintiffs who are natural persons adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 171, as if fully set forth herein, and further allege.

177.  Due to the negligence described herein, Named Plaintiffs and the members of the classes have suffered discernable physical manifestations and injuries of trauma from the negligent conduct, including, but not limited, to physical pains, headaches, anxiety, and insomnia.

178.  These physical injuries and manifestations have been directly caused by the by the psychological trauma suffered due to Defendant's egregious conduct and its effect on themselves and their loved ones.

179.  Named Plaintiffs and the members of the classes have been in close proximity to the negligent conduct causing their injuries.

180.   Named Plaintiffs and the members of the classes have a close personal relationship to the directly injured persons if it is not themselves who have been directly injured.

181.   As a direct and proximate result of Defendants' conduct as described herein, Named Plaintiffs and the members of the classes have been injured and harmed, and have suffered damages and economic harms, and seek actual, special, and compensatory damages.

**COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
(Named Plaintiffs and Class Members Who Are Natural Persons;
Against all Defendants)

182.   Named Plaintiffs who are natural persons adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 171, as if fully set forth herein, and further allege:

183.   Alternatively to the negligence described herein, Defendants acted intentionally and/or recklessly out of their own economic self-interest, and knew or should have known that emotional distress would likely result from their conduct.

184.   Defendants' conduct, as described herein, was outrageous, going beyond all bounds of decency, and is utterly intolerable in a civilized world.

185.   Defendants' conduct has caused severe emotional distress to the Named Plaintiffs and the members of the classes.

186.   As a direct and proximate result of Defendants' intentional and reckless conduct, as described herein, Named Plaintiffs and the members of the classes have been injured and harmed, and have suffered damages and economic harms, and seek actual, special, and compensatory damages.

**COUNT IV – STRICT LIABILITY FOR CONDUCTING ULTRAHAZARDOUS ACTIVITY**
(Named Plaintiffs and each Class and Sub-Class; Against all Defendants)

187.    Named Plaintiffs adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 171, as if fully set forth herein, and further allege:

188.    WIV is the only declared site in China capable of working with deadly viruses, and handles and manipulates such viruses, including "gain of function" manipulation, that makes the viruses more dangerous, and without having vaccines or antidotes available.

189.    Apart from the work of Dr. Shi Zhengli, as more fully described herein, which was inherently dangerous, in February, after the PRC's President and CCP's General Secretary Xi Jinping finally began speaking openly about the outbreak and its spread, it was reported by the media that the Chinese Ministry of Science and Technology released a new directive titled: "Instructions on strengthening biosecurity management in microbiology labs that handle advanced viruses like the novel coronavirus."  Clearly, Defendants knew or should have known about containment issues within the WIV labs.

190.    The CCP's effect on the silencing of transparency of researchers and employees at WIV in favor of adherence to the Party, led to the hiding of safety, security and containment issues at the WIV labs.

191.    WIV is in close proximity to the Wuhan Huanan Seafood "wet market" where COVID-19 is alleged to have originated.

192.    Researchers and employees of WIV, including the P4 and P3 labs, lived and worked in Wuhan and came into regular and routine contact with the public.

193.    Furthermore, a researcher at WIV was jailed in February for selling infected research animals to the wet markets instead of incinerating them, as is required by regulation and protocol.

194.    The conduct of Defendants in connection with activities at WIV constitutes an ultrahazardous activity under U.S. and Florida law because:

    a.  The conduct necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care;

    b.   The activities at the lab are not a matter of common usage; and

    c.  The activities are not of substantial value to any community.

195.    The harms alleged herein are the result of Defendants' ultrahazardous activity.

196.    The harms suffered by the Named Plaintiffs and members of the classes are within the abnormal risk of harm posed by Defendants' ultrahazardous activity.

197.    By conducting this ultrahazardous activity, Defendants' acts and omissions demonstrate a conscious disregard or indifference to the rights, welfare, and safety of Named Plaintiffs and the members of the classes.

198.    As a direct and proximate result of Defendants' ultrahazardous activity, as described herein, Named Plaintiffs and the members of the classes have been injured and harmed, and have suffered damages and economic harms, and seek actual, special, and compensatory damages.

199.    Because Defendants engaged in ultrahazardous activity that caused damages to Named Plaintiffs and the members of the classes, Defendants are strictly liable to them for their damages.

**COUNT V – INTENTIONAL TORTS – TOXIC BATTERY/CIVIL ASSAULT**
(Named Plaintiffs and Class Members Who Are Natural Persons;
Against all Defendants)

200.    Named Plaintiffs who are natural persons adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 171, as if fully set forth herein, and further allege:

201.    Defendants through their active concealment of the dangers of COVID-19, and failure to contain it, set in motion a virus (and carriers of the virus) that allow/allowed the virus to touch Named Plaintiffs and class members in a harmful and offensive manner, and infecting them.

202.    Defendants acted with the substantial certainty that the harm would occur,

203.    Alternatively, Defendants' conduct, as described herein, put Named Plaintiffs and class members who did not/do not become infected with the virus, in fear of the imminent toxic battery described herein.

204.    Defendants' intent for either tort is transferable to the other tort.

205.    As a result of Defendants' commission of both the toxic battery and civil assault, Named Plaintiffs and class members have been injured and harmed, and seek nominal, actual and compensatory damages.


**COUNT VI – WRONGFUL DEATH**
(On behalf of the Wrongful Death/Survivor Classes, Against All Defendants)

206.    Named Plaintiffs of the Wrongful Death/Survivor Classes adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through XXX, as if fully set forth herein, and further allege:

207.    The Survivor Class of Named Plaintiffs, who will be acting as personal representatives of the estates of their family members who have died as a result of the pandemic, bring this action for wrongful death proximately caused by Defendants' conduct as described herein, which caused the family members to die from the effects of COVID-19.

208.    Surviving family members or estates of those wrongfully killed are entitled to recover damages from Defendants for these illegal and wrongful deaths. The family members or estates are entitled to recover full damages incurred, as fair and just compensation for the injuries resulting from these wrongful deaths. Those responsible for these deaths must be held accountable for the losses incurred.

209.    The injuries and damages suffered by the Plaintiffs were proximately caused by the intentional, malicious, reckless, criminal, grossly negligent or negligent acts of the Defendants as described herein.

210.    As a direct and proximate result of the wrongful deaths of the decedents, their statutory survivors (including dependents, descendants, siblings and parents) members have suffered financially and been deprived of all future aid, income, assistance, services, comfort, companionship, affection and financial support of their loved ones.

211.    As a direct and proximate result of the Defendants' acts, as described herein and that caused the wrongful death of decedents, their survivors suffer and will continue to suffer permanent, physical and emotional distress, severe trauma, and lasting physical, emotional, and psychological injuries.

212.    As a further result of intentional, willful, wanton, malicious, reckless, criminal, negligent, wrongful, illegal and tortious acts and conduct of the Defendants, the Named Plaintiffs of the Survivor Class and those class members, have incurred actual damages including but not limited to ongoing medical expenses related to psychological trauma, physical injuries, funeral expenses and other expenses and losses for which they are entitled to full and fair recovery.

## COUNT VII – GROSS NEGLIGENCE
(Named Plaintiffs and each Class and Sub-Class; Against all Defendants)

213.    Named Plaintiffs adopt, incorporate by reference, and restate the foregoing allegations in paragraphs 1 through 171, as if fully set forth herein, and further allege:

214.    Defendants had a duty to persons in the United States, including Named Plaintiffs and the members of the classes, to not act negligently or without care in their handling of the COVID-19 outbreak, such that COVID-19 did not spread as it did.

215.    Defendants breached their duty to Plaintiffs and the members of the classes, by, among other breaches:

    a.  Failure to admit their knowledge of the dangers of the virus, its lethalness, and the ease of human-to-human transmission;

    b.  Failure to contain the virus in its early stages when they knew or should have known of its dangers and ease of transmission;

    c.  Failure to contain the virus more quickly when the spread was apparent;

    d.  Failure to restrict mass public gathering and travel from Wuhan when they knew or should have known of the dangers of the virus and ease of transmission;

    e.  Failure of the governmental entities to adequately and reasonably supervise the outbreak and contain its effects;

     f.   Failure to provide adequate and reasonable warning to Named Plaintiffs and members of the classes when they knew or should have known of the dangers described herein; and

     g.   Dissemination of materials and statements that provided the wrong information to people within and outside China.

216.   Defendants acted intentionally, wantonly, or recklessly, such that the breach of their duties constituted gross negligence.

217.   As a direct and proximate result of Defendants' breaches as described herein, Named Plaintiffs and the members of the classes have been injured and harmed, and have suffered damages and economic harms, and seek actual, special, and compensatory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, MARTA REYES, LAWRENCE WOOD, STEPHEN CLYNE, THE PITCHING LAB LLC d/b/a TBT TRAINING, TODD KUNTZE, SAUNDRA ANDRINGA-MEUER, JESSICA MERRITT, JOHN VECCHIARELLO, LINDA IGLESIAS, CONSTANCE GREENE, BRYAN EADS, JENNIFER MITCHELL, as Personal Representative of the Estate of James Mitchell, LORRAINE CAGGIANO MAIORINO, RAY BODINE, GEORGE RODOZINSKI, KIMBERLY ELLER, SHERRY WERNER, WILLIAM DAMELIO, JUDY HART, SB HOLDINGS I, LLC, ROBERT JARVIS, SEAGRASS RESORT, LLC, BILL MCCUTCHEON, DR. ANDREW NEWMAN, MR. M'S SANDWICH SHOP, INC., JUPITER DONUTS, GALLERY ART GROUP, INC.; SOUTH FLORIDA SURFING CORP. d/b/a ISLAND WATER SPORTS MIAMI, SAMSON TOURS INC., EAST AIR CORPORATION, ROBERT SHAFFER, and KARL UMBACH,

individually and as putative Class Representatives, demand judgment against

Defendants, and pray for relief as follows:

a.    Certification of the Classes under Federal Rule of Civil Procedure 23 and appointment of Plaintiffs as representatives of the respective Classes and their undersigned counsel as Class counsel;

b.    An order appointing Named Plaintiffs as Class Representatives of the respective National and Florida Sub-Classes named herein;

c.    An order requiring that Defendants pay compensatory and other damages to Plaintiffs and the Class Members, for their economic and non-economic damages identified herein, to the full extent permitted by the law;

d.    An order awarding all damages allowed by any governing statutes;

e.    Statutory pre-judgment and post-judgment interest on any amounts awarded;

f.    Costs and expenses in this litigation, including, but not limited to, expert fees, filing fees, and reasonable attorneys' fees; and

g.    Such other relief as the Court may deem just and proper.

Dated this 4th day of May, 2020.

**THE LAW OFFICES OF**
**BERMAN & BERMAN, P.A.**
P.O. Box 272789
Boca Raton, FL 33427
Telephone: (561) 826-5200
Fax: (561) 826-5201

By:  */s Matthew T. Moore*
Matthew T. Moore, Esq.
Fla. Bar No. 70034
Primary: service@thebermanlawgroup.com
Secondary: mmoore@thebermanlawgroup.com

Vincent J. Duffy, Esq.
Fla. Bar No. 82151
Primary: service@thebermanlawgroup.com
Secondary: vduffy@thebermanlawgroup.com