**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Miami Division

MARTA REYES; LAWRENCE WOOD; *et al.,*
on behalf of themselves
and all those similarly situated,

    Plaintiffs,

v.

PEOPLE'S REPUBLIC OF CHINA;
COMMUNIST PARTY OF CHINA; *et al.,*

    Defendants.

_____/

CASE NO. 1:20-cv-21108-AMC
HON. AILEEN M. CANNON

CLASS ACTION

**MEMORANDUM OF LAW ON HAGUE SERVICE AND FSIA JURISDICTION**

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................... ii

Memorandum of Law .......................................................................................................... 1

Introduction ........................................................................................................................ 1

Argument ............................................................................................................................ 2

I. **Plaintiffs Request That the Court Grant Time to Make Service in Accordance with FSIA § 1608(a)(3) or (4)** ...................................................................................... 2

II. **No Exception to the FSIA Is Required for the Court to Exercise Jurisdiction Over the Chinese Communist Party (CCP)** ...................................................................... 6

    A. The CCP Does Not Fulfil the Criteria of "Foreign State" for FSIA Purposes ...................... 7

        1. *U.S. courts have recognized that a political party is not a "foreign state" for FSIA purposes.* ................................................................................................ 8

        2. *The Constitution of China does not identify the CCP as an organ, subdivision, or other entity that would satisfy the second criterion of § 1603(b)* ................. 10

        3. *International authorities do not support the contention that a political party is a "foreign state."* ............................................................................................ 13

    B. In the Alternative, If the Court Were to Find That an Exception to the FSIA Is Required for the CCP, Then the CCP Falls Within One or More FSIA Exceptions ..................................... 16

III. **Defendant PRC and Any Other Defendant Judged to Be a "Foreign State" for FSIA Purposes, Falls Under the Exceptions to Immunity Indicated In §§ 1605(a)(2), 1605(a)(5), and 1605B** ................................................................................................ 16

    A. The Wrongful Conduct of the PRC and Its Political Subdivisions, Agencies, and Instrumentalities Falls Under the Commercial Activity Exception of § 1605(A)(2) ........ 17

        1. *Defendants' acts that are the direct cause of injuries for which Plaintiffs seek relief are "commercial activity."* ........................................................................ 18

        2. *Plaintiffs' action is "based upon" Defendants' acts outside the U.S. in connection with commercial activity* ..................................................................... 19

        3. *Defendants' acts have had a direct effect in the U.S.* ................................... 22

    B. The Wrongful Conduct of the PRC and Its Political Subdivisions, Agencies, and Instrumentalities Falls Under the Tortious Act or Omission Exception of § 1605(A)(5) . 24

        1. *Defendants' conduct is not protected by either of the § 1605(a)(5) safe harbors* ....... 25

        2. *Plaintiffs have alleged tortious conduct of Defendants occurring in the United States* ................................................................................................... 26

        3. *Tortious acts or omissions of Defendants* ..................................................... 30

    C. The Wrongful Conduct of the PRC and Its Political Subdivisions, Agencies, and Instrumentalities Falls Under the International Terrorism Exception of § 1605B ........... 30

Conclusion ........................................................................................................................ 34

# TABLE OF AUTHORITIES

*Africa Growth Corp. v. Rep. of Angl.*, Case No. 09-cv-21995,
2019 U.S. Dist. LEXIS (S.D. Fla. Nov. 25, 2019)................................................................n.47
*Al Shimaria v. CACI Premier Technology, Inc.*, 368 F.Supp.3d 935 (E.D. Va. 2019) ..............n.57
*Aldana v. Del Monte Fresh Produce, N.A. (Aldana II), Inc.*, 416 F.3d 1242 (11th Cir. 2005) ...n.33
*Aldana v. Fresh Del Monte Produce, N.A., Inc.,* 305 F. Supp. 2d 1285 (S.D. Fla. 2003).........n.33
*Alejandre v. Telefonica Larga Distancia de P., Inc.*, 183 F.3d 1277 (11th Cir. 1999) ...................7
*Animal Science Products, Inc v. Hebei Welcome Pharmaceutical Co. Ltd.*,
138 S. Ct. 1865 (2018)..........................................................................................................n.18
*Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*,179 F.3d. 1279 (11th Cir. 1999) ............n.33
*Argentine Rep. v. Amerada Hess Ship'g Corp.*, 488 U.S. 428, 441 (1989)................................27
*Asociacion de Reclamantes v.  United Mexican States*, 735 F.2d 1517 (D.C. Cir. 1984).......28, 29
*AT&T Corp. v. Bah. Tourist Office*, Case No. 04-cv-60249,
2005 U.S. Dist. LEXIS 57548 (S.D. Fla. Aug. 17, 2005)....................................................n.37
*Berkovitz v. United States,* 486 U.S. 531 (1988) ........................................................................25
*Bird Wingate, LLC II v. Diaz Reus & Targ, LLP*, Case No. 10-cv-21175,
2010 U.S. Dist. LEXIS 130821 (S.D. Fla. Nov. 30, 2010)......................................n.18, n.37
*Bolivarian Rep. of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312 (2017) ...n.47
*Broidy Capital Mgmt., LLC v. Qatar*, 982 F.3d 582 (9th Cir. 2020)..........................27, n.50, n.55
*Burda Media, Inc. v. Viertel*, 417 F.3d 292 (2nd Cir., 2005)..........................................................n.7
*Callejo v. Bancomer, S.A.*, 764 F.2d 1101 (5th Cir. 1985) ..........................................................23
*Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012 (2d Cir. 1993)..................................n.37
*Chen v. China Cent. TV*, Case No. 06-cv-414 2007,
U.S. Dist. LEXIS 58503 at *7 (S.D.N.Y. Aug. 9, 2007) ......................................................10
*Cohen v. Shushan,* 212 So. 3d 1113 (2d DCA 2017) ................................................................n.18
*Crystallex Int'l Corp. v. Venezuela,* 251 F. Supp. 3d 758 (D. Del. 2017) ..............................22, 23
*CYBERsitter, LLC v. People's Rep. of China,* No. 10-cv-38,
2010 U.S. Dist. LEXIS 151111 (C.D. Cal. Sep. 13, 2010)......................................................n.4
*Dammarell v. Islamic Republic of Iran*, Case No. 01-cv-2224,
2005 U.S. Dist. LEXIS 5343 (D.D.C. Mar. 29, 2005)............................................................30
*Devengoechea v. Bolivarian Rep. of Venez.,* 889 F.3d 1213 (11th Cir. 2018) .........................18–19
*Factor v. Laubenheimer*, 290 U.S. 276 (1933) ..............................................................................n.4
*First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611 (1983).......30
*Foster Logging, Inc. v. United States,* 973 F.3d 1152 (11th Cir. 2020) ....................................n.50
*Frank v. Comm. of Antigua & Barbuda,* 842 F.3d 362 (5th Cir. 2016)..................................17, 23
*Fukuda v. Ministry of Foreign Affairs of Japan*, Case No. 15-cv-00290,
2017 U.S. Dist. LEXIS 9550 (D. Haw. Jan. 24, 2017)....................................................28–29
*Gonzalez v. Google, Inc.*, 282 F.Supp.3d 1150, 1160 (N.D. Cal. 2017)....................................34
*Hernandez-Caballero v. U.S. Att'y Gen'l*, 250 Fed. Appx. 275 (11th Cir. 2007) ...........................9
*In re Berrocal*, Case No. 17-cv-22197,
2017 U.S. Dist. LEXIS 140687 (S.D. Fla. Aug. 31, 2017)....................................................n.4
*In re Combat*, Case No. 19-md-2885,
2020 U.S. Dist. LEXIS 173730 (N.D. Fla. Feb. 18, 2020)....................................................n.7
*In re Takata Airbag Prod. Liab. Lit.*, Case No. 15-md-02599,
2017 U.S. Dist. LEXIS 71816 (S.D. Fla. Mar. 24, 2017)......................................................n.5

*In re: Terrorist Attacks on September 11, 2001*, 298 F.Supp.3d 631 (S.D.N.Y. 2018) ...............31
*In the Matter of the Complaint of SEDCO, Inc.,* 543 F. Supp. 561 (S.D.Tex., 1984).............28, 29
*Jam v. Int'l Finance Corp,* 139 S. Ct. 759 (2019) ...........................................................n.47
*Jerez v. Republic of Cuba,* 775 F.3d, 419 (D.C. Cir., 2014)...................................n.56, 29
*Kidane v. Fed'l Dem. Rep. of Ethiopia,* 851 F.3d 7 (D.C. Cir., 2017) .....................28, 29
*Kurd v. Republic of Turkey,* 438 F.Supp.3d 63 (D.D.C. 2020)..........................................n.50
*Letelier v. Rep. of* Chile, 488 F. Supp. 665 (D.D.C., 1980)...........................26, 27, n.53
*Liu v. Republic of China,* 892 F.2d 1419 (9th Cir. 1989) ............................................27
*OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015) ...................................19–22
*O'Bryan v. Holy See,* 556 F.3d 361 (6th Cir. 2009) ...................................................n.49, 30
*Odyssey Marine Exploration, Inc. v. Unidentified, Shipwrecked* Vessel,
    675 F. Supp. 2d 1126 (M.D. Fla. 2009).........................................................n.37
*Olsen v. Gov't of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984).............................27, 28
*Owens v. Rep. of Sudan*, 864 F.3d 751 (D.C. Cir., 2017) ...............................................31
*Papir v. Wurms,* Case No. 02-cv-3273,
    2005 U.S. Dist. LEXIS 2201 (S.D.N.Y. Feb. 15, 2005) ...........................n.16
*Paroline v. U.S.*, 572 U.S. 464 (2014) ....................................................................31
*Pescatore v. Pan Am,* 97 F.3d 1 (2d Cir. 1996)......................................................30
*R&R Int'l Consulting LLC v. Banco do Brasil, S.A.*, 981 F.3d 1239 (11th Cir. 2020)...............n.47
*Republic of Argentina v. Weltover,* 504 U.S. 607 (1992) ...............................22, 24, n.47
*Republic of Sudan v. Harrison,* 139 S. Ct. 1048 (2019) ................................4, 5, n.10
*Rodriguez, et al. v. Pan Am. Health Org.*, Case No. 18-cv-24995,
    2020 U.S. Dist. LEXIS 58987 (S.D. Fla. Apr. 3, 2020) ..............................6–7
*Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)...................................................31
*S & Davis Inter'l, Inc. v. Rep. of Yemen,* 218 F.3d 1292 (11th Cir. 2000)....................22
*Salini Costruttori S.p.A. v. Kingdom of Morocco,* 233 F. Supp. 3d 190 (D.D.C. 2017) ..............n.1
*Saludes v. Rep. de Cuba*, 77 F. Supp. 2d 1243 (S.D. Fla. 2008) .............................8, n.16
*Samco Global Arms, Inc. v. Rep. of Honduras*, Case No. 10-cv-20196,
    2012 U.S. Dist. LEXIS 65373 (S.D. Fla. Jan. 25, 2012) ...........................n.68
*Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006)......................................................n.6
*Santilli v. Cardone,* Case No. 07-cv-308,
    2008 U.S. Dist. LEXIS 111677 (M.D. Fla. June 4, 2008).........................n.37
*Sàrl v. Bolivarian Rep. of Venez.*, Case No. 17-cv-2559,
    2020 U.S. Dist. LEXIS 241174 (D.D.C. Dec. 23, 2020).........................n.11
*Saudi Arabia v. Nelson,* 507 U.S. 349 (1993)...................................................18–21
*Sikhs for Justice v. Nath and Indian National Congress*, 893 F. Supp. 2d 598 (S.D.N.Y. 2012).10
*Stena Rederi AB v. Comision de Contratos*, 923 F.2d 380 (5th Cir. 1991)...................17
*Swafford v. United States,* 839 F.3d 1365 (11th Cir. 2016).........................................n.50
*Tachiona v. Mugabe*, 169 F. Supp. 2d 259 (S.D.N.Y., 2001) ....................................n.15
*Tachiona v. U.S.*, 386 F.3d 205 (2nd Cir. 2004).....................................8, n.15, n.28
*Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981)...........23
*Twohy v. First Nat'l Bank of Chicago,* 758 F.2d 1185 (7th Cir. 1985) ...........................n.18
*U.S. ex rel. Walterspiel v. Bayer AG*, 639 Fed. Appx. 164 (4th Cir. 2016)........................5
*U.S. v. Belfast,* 611 F.3d 783 (11th Cir. 2010).......................................................n.6
*U.S. v. Gaubert,* 499 U.S. 315, 322–23 (1991)......................................................25
*U.S. v. Louisiana,* 394 U.S. 11 (1969) ...............................................................n.30

iv

*U.S. v. Postal,* 589 F.2d 862 (5th Cir. 1982)...............................................................n.30
*United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n,* 33 F.3d 1232 (10th Cir. 1994)......22
*Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534 (11th Cir. 1993) ...........................18
*Weininger v. Castro*, 462 F.Supp. 457 (S.D.N.Y. 2006) ..................................................7
*Wilhite v. United States,* Case No.19-cv-102,
   2020 U.S. Dist. LEXIS 159295 (D. Mont., Aug. 31, 2020) ............................n.53
*Yaodi Hu v Comm. Pty. of China*, Case No. 12-cv-1213,
   2012 U.S. Dist. LEXIS 186286 (WD Mich. Nov. 20, 2021)..............................8
*Zhang v. Baidu.com Inc*, 932 F. Supp. 2d 561 (S.D.N.Y. 2013) ..................................n.5

## RULES & STATUTES

Fed.R.Civ.P. 4 .............................................................15, 16, n.1, n.5, n.39
Fed.R.Civ.P. 44.1...........................................................................................n.18
28 U.S.C § 1330(a), (b) (Lexis 2021) ..................................................*passim*
Foreign Sovereign Immunities Act of 1976 (FSIA) 28 U.S.C. § 1602, *et seq.* (Lexis 2021)..........1
FSIA § 1603(a), (b)................................................................n.16– n.18, 7, 9
FSIA §1605(a)(2) ...........................................................................*passim*
FSIA § 1605(a)(5)...........................................................................*passim*
FSIA § 1605B ...............................................................................*passim*
FSIA § 1608(a)(1).........................................................................*passim*
FSIA § 1608(a)(2).........................................................................*passim*
FSIA § 1608(a)(3).........................................................................*passim*
FSIA § 1608(a)(4).........................................................................*passim*
18 U.S.C. § 2331 (Lexis 2021) ...............................................................31–33

## MISCELLANEOUS

162 Cong. Rec. S2845-01 (May 17, 2016) ...........................................................34
Const. of the People's Republic of China, 4 December 1982 (as amended).........10–12, n.19–n.25
Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or
   Commercial Matters (Hague Convention),
   *done* Nov. 15, 1965, 20 U.S.T. 363, 658 U.N.T.S. 169 ..............................1, n.1
Hague Convention Article 2 ...............................................................................1
Hague Convention Article 10 .............................................................................4
Hague Convention Article 13 ........................................................................2, n.7
Hague Convention Article 15 .........................................................................3, 34
Int'l L. Com. (ILC) Yearbook 2001 ..................................................13–15, n.31–n.36
*Restatement (Second) Foreign Relations Law of the United States* .........................................n.41
*Restatement (Third) of Foreign Relations Law of the United States*..........................................n.6
WTO Panel Report, *Russia—Measures Concerning Traffic in Transit,* WT/DS512/R, Apr. 5,
2019.................................................................................................................n.6

## MEMORANDUM OF LAW ON HAGUE SERVICE AND FSIA JURISDICTION

Plaintiffs submit this Memorandum in response to the Court's Order of February 19, 2021, seeking a brief addressing (1) whether Defendants have been properly served under the Hague Convention, particularly in light of Defendants' invocation of Article 13 of the Convention and submission of Docket Entry 141-1; and (2) whether the Court has subject matter jurisdiction over this matter under the Foreign Sovereign Immunities Act of 1976 (FSIA), which necessarily also includes whether the Chinese Communist Party (CCP) requires an exception to the FSIA.  28 U.S.C. § 1602, et seq. (Lexis 2021).  As explained in more detail below, this case against these Defendants is properly before the Court, in compliance with the Hague Convention, including its service requirements, as well as the FSIA.

## INTRODUCTION

Plaintiffs have attempted service on the People's Republic of China (PRC) in accordance with the Hague Convention provisions on "Central Authorities" and in compliance with FSIA § 1608(a)(2).  As in other cases in which foreign states have been subject to FSIA exceptions, delays in service of process have arisen in the present case due to the foreign state's refusal to accept service under the proper methods indicated by treaty and by statute.  Plaintiffs respectfully request time to make service in accordance with § 1608(a)(3) or (4), as the Court directs (see below **Part I**).  In addition, no exception to the FSIA is required for Defendant Chinese Communist Party (CCP) because the CCP does not fall within any branch of the widely accepted definition of "foreign state," including for FSIA purposes (see below **Part II**).  Furthermore, Defendant the People's Republic of China (PRC), and the remaining Defendants, to the extent they are a "foreign state" (or organs, agents or instrumentalities) for FSIA purposes, fall under the exceptions to immunity indicated in §§ 1605(a)(2), 1605(a)(5), and/or 1605B (see below **Part III**).

Plaintiffs are mindful that this phase of the proceedings is operating without the benefit of the adversarial input that otherwise would be provided by opposing counsel for Defendants who thus far refuse to appear.  As a result, this Memorandum of Law uses an inclusive approach to fully inform the Court of diverse perspectives.  Full consideration of such diverse perspectives can be especially appropriate for this setting, where a court within our common law system is having to adjudicate in a way that would adversely impact foreign sovereign parties who have decided to remain absent and are themselves grounded in a civil law system of the type used throughout Continental Europe, South America, and East Asia, where the adjudicator plays a more inquisitorial or investigative role and is accordingly expected to build and research the record on its own.  While this more fulsome approach necessarily includes a more complete exploration of the legal doctrine than would be strictly necessary in an ordinary adversarial proceeding, the bottom line is unaffected: this case can and should move forward to the merits.

## **ARGUMENT**

## I.   **PLAINTIFFS REQUEST THAT THE COURT GRANT TIME TO MAKE SERVICE IN ACCORDANCE WITH FSIA § 1608(a)(3) OR (4).**

Plaintiffs—being in the United States which is one of the "other Contracting States" of the Hague Service Convention[1]—at the outset directed their requests for service to China's Central Authority in compliance with the service requirements for purposes of Convention Article 2 and FSIA § 1608(a)(2).[2] China, however, after a wait of six months, rejected Plaintiffs' attempt to

---

[1]   Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (Hague Convention), *done* No*v.* 15, 1965, 20 U.S.T. 363, 658 U.N.T.S. 169.
[2]   Plaintiffs therefore already have made proper service "in accordance with an applicable international convention on service of judicial documents." Fed.R.Civ.P. Rule 4(j) provides that "[a] foreign state or its political subdivision, agency, or instrumentality must be served in accordance with 28 U.S.C. §1608." *See Salini Costruttori S.p.A. v. Kingdom of Morocco,* 233 F. Supp. 3d 190, 195 n.4 (D.D.C. 2017).

serve in this manner, invoking Article 13 of the Convention.[3]  Plaintiffs previously posited to the Court that they served Defendants through Article 2, and because China merely sent back a slip of paper with an "X" to mark Article 13, Defendants had opened themselves to a finding of default under Article 15, as that would not qualify as a "certificate" (a position that partially spurred the Court's request for this briefing).  This position was because such an *ipsa dixit* response, completely lacking explanation or proof, does not meet the good faith standard that U.S. courts have held to apply to obligations under treaties[4] and that applies to any conduct before a court.

However, because research for this brief has borne out that district courts have tended to be highly deferential to countries claiming to have avoided service by invoking Article 13,[5] and in the interest of saving the Court's time, Plaintiffs here elect to provisionally waive available arguments that this Court should not accept China's attempt to avoid service from having been properly served.[6]  Instead, Plaintiffs respectfully request that the Court grant time to make service

---

[3] [DE 141-1].

[4] *See*, *e*.*g*., *In re Berrocal*, Case No. 17-cv-22197, 2017 U.S. Dist. LEXIS 140687, at *75 (S.D. Fla. Aug. 31, 2017)(" The U.S. Supreme Court explained nearly eighty years ago that 'a narrow and restricted construction is to be avoided' when interpreting treaties.") (quoting *Factor v. Laubenheimer*, 290 U.S. 276, 293–94 (1933)). Indeed, China has previously proven it is well capable of better articulating their sovereignty and national security concerns beyond a bare "X." *See*, *e*.*g*., *CYBERsitter, LLC v. People's Republic of China,* No. 10-cv-38, 2010 U.S. Dist. LEXIS 151111, at *9 (C.D. Cal. Sep. 13, 2010) (Ministry of Justice letter provided short explanation).

[5] *See*, *e*.*g*., *Zhang v. Baidu.com Inc*, 932 F. Supp. 2d 561, 566 (S.D.N.Y. 2013) (no jurisdiction even to address whether China properly invoked Article 13 and, furthermore, noting that "[n]othing in Article 13 limits [the] authority [of a state to invoke Article 13] to cases brought against the state alone; instead, it allows 'the [foreign sovereign] State' to decline to effect service pursuant to the Convention, without regard to the parties to be served."). *Cf. In re Takata Airbag Products Liability litigation,* Case No. 15-md-02599, 2017 U.S. Dist. LEXIS 71816 at *63 & n.2 (S.D. Fla. Mar. 24, 2017)(assessing the impact of Article 13 and recommending service be allowed via other methods of Fed.R.Ci*v*.P. 4).

[6] Tribunals have held that sovereignty or security exceptions are justiciable so as not to leave this powerful escape from legitimate adjudicative process "to the unfettered discretion of the invoking [country]," so the foreign sovereign doesn't through mere deference improperly use narrow but legitimate exceptions "as a means to circumvent their obligations."  WTO Panel Report, *Russia— Measures Concerning Traffic in Transit,* WT/DS512/R, Apr. 5, 2019, ¶¶ 7.102, 7.132-7.133. In

3

upon such Defendant or Defendants by means of the method of service indicated in § 1608(a)(3) or (4), as the Court directs.[7]

Plaintiffs note that use of the direct mail method of § 1608(a)(3), which corresponds to Hague Convention Article 10, risks raising issues of international comity because China declared, in its public notification to the Hague Convention, that it "oppose[s] the service of documents ... by the methods provided by Article 10."[8] As a result, the Court may prefer to direct Plaintiffs to attempt service, instead, by the method indicated in § 1608(a)(4) (diplomatic channels).

China's opposition to Article 10 service under the Hague Convention, and China's non-appearance in the present proceedings may raise questions of first impression: namely, whether the § 1608(a)(4) method of service is available without a prior attempt to serve under § 1608(a)(3) in deference to the foreign sovereign's having opposed the § 1608(a)(3) method of service, as does China. This opposition to service by direct mail is within China's rights under the Convention, but highlights a possible incongruity between the framework of the Hague Convention and the framework of the statute that Congress adopted in § 1608(a). Congress' statutory framework "sets out in hierarchical order ... four methods by which '[s]ervice ... *shall* be made.'" *Republic of Sudan*

---

those settings, the sovereign invoking the exceptions has been required "to articulate the ... security interests said to arise ... sufficiently enough to demonstrate their veracity." *Id.* at 7.134. *See also Sanchez-Llamas v. Oregon*, 548 U.S. 331, 346 (2006) (quoting the *Restatement (Third) of Foreign Relations Law of the United States,* as to the requirement of good faith in treaty interpretation); *U.S. v. Belfast,* 611 F.3d 783, 806–807 (11th Cir. 2010) (finding that good faith requires generous interpretation of obligations under the UN Torture Convention).

[7] Other methods of service remain available to Plaintiffs, because "Article 13 only applies to attempted service through a country's... Central Authority": *In re Combat*, No. 19-md-2885, 2020 U.S. Dist. LEXIS 173730, at *20 (N.D. Fla. Feb. 18, 2020); *see also Burda Media, Inc. v. Viertel*, 417 F.3d 292, 301 (2nd Cir., 2005) (although "the Hague Convention carefully articulates the procedure that a litigant must follow in order to perfect service abroad ... it does not prescribe the procedure for the forum Court to follow should an element of the procedure fail" (internal quotation marks omitted)) Moreover, § 1608(a) has a four step hierarchy.

[8] *See* https://www.hcch.net/en/instruments/conventions/status-table/ notifications/?csid=393 &disp=resdn.

*v. Harrison,* 139 S. Ct. 1048, 1054 (2019) (quoting § 1608(a) (emphasis added).   A plausible interpretation of that statute is that it requires a plaintiff to attempt service under the third-listed method—§ 1608(a)(3), the direct mail method—before reaching the fourth-listed method—§ 1608(a)(4), which involves U.S. Secretary of State's diplomatic channel.[9]

The Supreme Court in its recent judgment in *Harrison* seems to suggest that after service under § 1608(a)(2) has failed, that the next step is required to be service under § 1608(a)(3) before proceeding to § 1608(a)(4).[10]   Moreover, lower court decisions do not lend clarity.[11]   Yet, in *U.S. ex rel. Walterspiel v. Bayer AG,* the Fourth Circuit held that plaintiff's attempt to serve process by direct mail "was ineffective," because Germany— like China —has objected to the Article 10 service method.   *See* 639 Fed. Appx. 164, 167 (4th Cir. 2016).   Such an approach gives deference to China's invocation of its rights under the Convention.

---

[9] The State Department says *not* to use § 1608(a)(3) with a state such as China that objects to service by mail.   *See* "How do I effect service on a foreign state or political subdivision?", *available at* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Service-of-Process/Foreign-Sovereign-Immunities-Act.html.   But, with respect, the State Department does not have the final word on the matter.

[10] 139 S. Ct. at 1054 ("*If* service is not possible under either of the first two methods [§ 1608(a)(1) and (2)], the third method ... may be used ...," "[f]inally, *if* service cannot be made within 30 days under § 1608(a)(3), service may be effected by sending the service packet 'by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia,' for transmittal through diplomatic channels to the foreign state'") (quoting § 1608(a)(4) (emphasis added).

[11] *See Sàrl v. Bolivarian Republic of Venez.*, Case No. 17-cv-2559, 2020 U.S. Dist. LEXIS 241174, at *14 (D.D.C. Dec. 23, 2020), where the D.C. District Court first suggests that the proper course of action is for a plaintiff to skip a method in the § 1608(a) hierarchy, where the state on which the plaintiff is attempting service has made clear that it (the state) will not accept service by that method, yet then says in the same paragraph:

> "[i]f *both of those methods* [§ 1608(a)(1) and (2)] fail, the plaintiff may have the clerk of court dispatch service 'to the head of the ministry of foreign affairs of the foreign state.' § 1608(a)(3). Finally, if *all other attempts* prove unfruitful, then the plaintiff may ask the clerk of court to send notice of suit to the Secretary of State, who will then serve the papers through diplomatic channels with the foreign state [i.e., the § 1608(a)(4) method]."

*Id.* (emphasis added). This passage suggests that "all other attempts" must be made before a plaintiff asks the clerk to use the § 1608(a)(4) method.

As a practical matter, this leaves the Court in a somewhat awkward position of deciding between a determination that most closely respects the statutory framework of § 1608(a), and one that most closely respects the Convention framework and the wishes of China, invoking its rights as a foreign sovereign under the Convention.  For these reasons, Plaintiffs here respectfully request the Court determine if service under § 1608(a)(3) is necessary, or if it may proceed directly to § 1608(a)(4).  Moreover, pursuant to the State Department's "FSIA Checklist," step four usually proceeds by a letter/direction from the Clerk of Court, *unless* the Court directs that Plaintiffs may directly contact the State Department.[12]  Thus, for either step three or four, direction from the Court will assist and is likely necessary for the process of completing service.

Step three (if the Court determines it is required) is only an approximately thirty-day process.[13]  The proper translations for step four have already been completed, and there would just need to be new sixty-day summonses issued, and the Complaint and paperwork can be submitted to the State Department.   Once the service packages are sent through the diplomatic channels, the China-based Defendants will have sixty days to respond, and if they do not respond, then the FSIA is satisfied and the case may proceed.[14]

## II.    No Exception to the FSIA Is Required for the Court to Exercise Jurisdiction Over the Chinese Communist Party (CCP).

The FSIA recognizes the jurisdictional immunities to which "foreign states" are entitled in courts in the United State*s* and also specifies the exceptions to those immunities.  *Rodriguez v.*

---

[12]   *See* U.S. Department of State, FSIA Checklist, No. 9, *available at* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Service-of-Process/FSIA-Checklist.html.

[13]   *See id.*, FSIA Checklist, No. 3.

[14]   Respectfully, Plaintiffs have been diligent in their service efforts, updating the Court every fifteen days until recently.  Plaintiffs will be equally diligent taking whatever next service steps the Court directs or allows, and will continue status reports should the Court want them. China is the entity that ignored the sixty days of the original summonses.

*Pan Am. Health Org.*, Case No. 18-cv-24995, 2020 U.S. Dist. LEXIS 58987, at *9–*12 (S.D. Fla. Apr. 3, 2020).  Congress was careful to define "foreign state" only to cover specified kinds of defendants.  § 1603(a), (b).  A defendant that does not fall within the definition of "foreign state" is not entitled to immunity and, therefore, no showing of an exception to immunity is necessary for a court to have jurisdiction over such a defendant.  Because the CCP is not a "foreign state" for FSIA purposes, this Court's jurisdiction over the CCP does not require a showing that the CCP falls within an immunity exception.

**A.    The CCP Does Not Fulfill the Criteria of "Foreign State" for FSIA Purposes.**

The FSIA states that the term "foreign state" covers "a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." § 1603(a).   In turn, § 1603(b) sets out three distinct criteria, all three of which must be met by an entity for that entity to be treated as an "agency of instrumentality" of a "foreign state" for purposes of the FSIA. § 1603(b)(1), (2), and (3).  If any entity fails any of these criteria, then FSIA immunity also fails.

The CCP fails to meet at least one of the statutory criteria because it is not "an organ of a foreign state or political subdivision thereof, or [an entity] a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." § 1603(b)(2).  Thus, the CCP is not a "foreign state" able to benefit from the FSIA's immunity.

The 11th Circuit has recognized that "[i]n assessing whether ... entities [such as the CCP] are agencies or instrumentalities of [a State], the Court is mindful that the instrumentality and its related government—not the plaintiff—will frequently possess most of the information needed ... and it may be difficult for the plaintiff to obtain discovery from them." *Weininger v. Castro*, 462 F. Supp. 457, 495 (S.D.N.Y. 2006) (quoting *Alejandre, et al. v. Telefonica Larga Distancia de P.R., Inc.*, 183 F.3d 1277, 1285 n.19 (11th Cir. 1999)) (internal quotation omitted).  As discussed

more fully below, a political party such as the CCP is not a "foreign state" (**Part II(A)(1)**); the evidence in PRC law confirms the CCP, in particular, is not part of the Chinese state (**Part II(A)(2)**); and evidence from international authorities who have considered the relation of various entities to states confirms more generally that it is only in exceptional situations that a political party might be treated as a "foreign state." (**Part II(A)(3)**).

### 1.    *U.S. courts have recognized that a political party is not a "foreign state" for FSIA purposes.*

As the district court noted in *Yaodi Hu v. Communist Party of China,* "the ... Communist Party of China" is "not entitled to FSIA immunity."  Case No. 12-cv-1213, 2012 U.S. Dist. LEXIS 186286, at *7 (WD Mich. Nov. 20, 2021).  This comports with the Second Circuit judgment in *Tachiona v. U.S.*, which held that a political party "is, after all, a private entity and not an agency or instrumentality of a foreign state." 386 F.3d 205, 222 (2nd Cir. 2004).[15]  It also is not inconsistent with the holding of the district court in *Saludes v. Republica de Cuba*, where the district court held that the Communist Party that rules Cuba is an agency or instrumentality of Cuba, but did so only for the express purpose of *expanding* liability under a different statute, not limiting liability due to sovereign immunity under the FSIA.  577 F. Supp. 2d 1243, 1251, 1253 (S.D. Fla. 2008) (addressing claims against a foreign state that the United States had designated to be a "state

---

[15] While the attempted service failed in *Tachiona*, it was because of *diplomatic* immunity. *Id.* at 224.  Such diplomatic immunity is not relevant in any way to Plaintiffs' service here under § 1608(a) on the CCP at its main office in Beijing.  As to the observation that a political party does not satisfy the criteria of "foreign state." The *Tachiona* proceedings had the benefit of a "Suggestion of Immunity" from the State Department, which had warned that "permitting this action to proceed against diplomatic agents of a party would be incompatible with the United States' foreign policy interests," but which said nothing to raise any concern about permitting an action against the political party at issue in the case.  *See Tachiona v. Mugabe,* 169 F. Supp. 2d 259, 296, 303 (S.D.N.Y., 2001). The court's conclusion that the foreign political party was not part of a "foreign state," and therefore not entitled to sovereign immunity, was carefully considered and sound.

sponsor of terrorism").[16] And neither of the two cases cited by *Saludes* is inconsistent with the view that the CCP is not immune under the FSIA.  One of those cases, which references the Cuban Communist Party, *Hernandez-Caballero v. U.S. Attorney General*, 250 Fed. Appx. 275 (11th Cir. 2007), had nothing do with immunity or the FSIA and instead concerned an individual's failure to disclose her membership in the Cuban Communist Party.  The one statement in *Hernandez-Caballero* about the relation between the Party and the state, which was in *dicta,* was that Ms. Hernandez-Caballero "did not dispute that the Cuban Communist Party controls the government of Cuba." *Id.* at 278.  But that is not a court holding that the Party "is an organ of [Cuba] or political subdivision thereof" for purposes of granting FSIA immunity.  That statement only suggests that the Party stands in a position of influence over Cuba.  Simply put, the relation described in *Hernandez-Caballero* is not the relation required under § 1603(b)(2) to show that an organ constitutes a "foreign state."[17] While the second case cited by *Saludes*, *Chen v. China Central Television*, does address immunity, the only defendant that the plaintiffs pursued in earnest in *Chen*

---

[16] By treating the Communist Party as part of Cuba for purposes of the suit, the district court did not confine the scope of the plaintiffs' action but, rather, expanded it:  the district court opened the Communist Party to suit for the same terrorist acts as alleged against Cuba.  In addition, and likely for the same reason, the analysis in the *Saludes* published opinion was very brief, and, not dispositive of the issues presented in the present case.  All that the published opinion in that case does is mention the three elements of the FSIA's § 1603(b) definition of "agency or instrumentality" and then conclude that the Partido Comunista de Cuba, "[b]ased on this definition ... is an agency or instrumentality of Cuba," on the way to expanding the reach of the underlying liability. 577 F. Supp. 2d at 1253.

[17] Moreover, even to the point where a private citizen or company or group controls a government, that relationship is not the one specified by Congress in § 1603(b)(2) to identify the entity as a "foreign state" for immunity purposes.  Having political influence or control over a state does not make an entity a state or an instrumentality of the state for purposes of FSIA immunity.  If a U.S. court were to hold that political influence or control over a state sufficed to make an entity a state for FSIA purposes, then serious difficulties would ensue.  A vast range of actors—individuals, political movements, business organizations, non-governmental activists, etc.—exercise influence, and in some instances, even control, over governments.  Congress did not legislate for such actors to be treated as "foreign states" for immunity purposes, unless such actors satisfy the express requirements of § 1603.

was China Central Television, an enterprise operating for the propaganda ministry of the government of China, and there was no claim against the CCP.  Case No. 06-cv-414 2007, U.S. Dist. LEXIS 58503, at *7 (S.D.N.Y. Aug. 9, 2007).  Simply put, neither of the two cases cited by *Saludes* addresses a fact-pattern similar to the one in this case.  Both of those cases involve facts that are inapposite and, likely for that reason, neither of the published opinions offers any analysis of their own that would support a determination that the CCP is an instrumentality of the sovereign for purposes of FSIA immunity.  Similarly, in *Sikhs for Justice v. Nath and Indian National Congress (INC)*, the district court found merit in the contention by the INC—India's ruling party at the relevant time—that the FSIA applies, but, vitally, on a record in which the INC was alleged to have been "acting under color of state law of the state of India and with the actual or apparent authority of the Government of India."  893 F.Supp.2d 598, 614 (S.D.N.Y. 2012).  In other words, the INC was acting as a subordinate unit of the government.  In contrast, the CCP is not in such a position in relation to the PRC because the CCP does not act as an instrumentality of the PRC, at least as far as the conduct Plaintiffs seek to remedy.

> **2.**    ***The Constitution of China does not identify the CCP as an organ, subdivision, or other entity that would satisfy the second criterion of § 1603(b).***

While the Constitution of China[18] elaborates the vast number of structures, organs, and subdivisions of the Chinese state, it says nothing to identify the CCP as part, agent, or

---

[18] Under Fed.R.Civ.P. 44.1, the Court, when making a determination of foreign law, "may consider any relevant material or source ... whether or not ... admissible under the Federal Rules of Evidence." *See Animal Science Products, Inc v. Hebei Welcome Pharmaceutical Co. Ltd.*, 138 S. Ct. 1865, 1872–73 (2018); *see also Cohen v. Shushan,* 212 So. 3d 1113 (2nd DCA 2017), quoting *Twohy v. First Nat'l Bank of Chicago,* 758 F.2d 1185, 1192 (7th Cir. 1985) for the proposition that "trial and appellate courts are urged to research and analyze foreign law independently."  When courts in this District have been asked to consider whether an entity is a "foreign state" for FSIA purposes, they have examined legal instruments, including foreign instruments, that give evidence of the entity's status.  *See Bird Wingate, LLC II v. Diaz Reus & Targ, LLP*, Case No. 10-cv-21175, 2010 U.S. Dist. LEXIS 130821, at *5 (S.D. Fla. Nov. 30, 2010).

instrumentality of the Chinese state in any way.[19]   Indeed, the Preamble of the PRC Constitution

gives an overview, running to approximately 1,100 words, of the history and achievements of

China, and in so doing draws attention to the role of the Party as having "led" the Chinese people

in "waging hard, protracted and tortuous struggles, armed and otherwise," resulting in 1949 in the

end of "imperialism, feudalism, and bureaucrat-capitalism."[20] Yet, the Preamble points out that it

was "the Chinese people," not the Party, that "won the great victory" and "founded the People's

Republic of China."[21] The Preamble even goes so far as to specifically give credit to other political

leadership in the person of Dr. Sun Yat-sen, the first leader of the Nationalist Party, and never a

member of the CCP, who "abolished the feudal monarchy and gave birth to the Republic of China"

in 1911, without then going further to mention the CCP.[22]   Nothing in the Preamble expresses or

implies that the Communist Party is an "organ of [China] or political subdivision thereof, or [an

---

[19] *See* Const. of the People's Republic of China, 4 December 1982 (as amended), *available at*
https://www.wipo.int/edocs/lexdocs/laws/en/cn/cn147en.pdf.   For example, the Sovereignty of
China is addressed in Article 2 of the Constitution, which provides in paragraph 2, "[t]he organs
through which the people exercise state power are the National People's Congress and the local
people's congresses at different levels." Article 16 addresses State Enterprises. Article 27
addresses state organs responsible for "carry[ing] out the principle of simple and efficient
administration." Article 30(1) provides for the administrative division of China into "provinces,
autonomous regions, and municipalities," all of which are "directly under the Central
Government." Article 30(2) provides for the division of provinces and autonomous regions into
"autonomous prefectures, counties, autonomous counties, and cities."   Article 30(3) provides for
the division of counties and autonomous counties into "townships, nationality townships, and
towns."   Article 31 allows the state to establish "Special Administrative Regions." (Hong Kong is
one of these).   Yet, none of these provisions mentions the CCP or any entity or body functionally
like the CCP. Similarly, Chapter Three of the Constitution, which consists of Articles 57 through
135, specifies in detail the "Structure of the State."   Yet, the CCP is not mentioned in any of the
provisions of Chapter Three either.   In fact, other than in its Preamble, there is no mention in the
constitution of the CCP at all.
[20] *Id.*
[21] *Id.*
[22] *Id.*

entity] a majority of whose shares or other ownership interest is owned by [China] or political subdivision thereof."[23]

The only reference to political parties in the Constitution of China is in Article 5, paragraph 4. That provision states that "[a]ll state organs, the armed forces, all political parties and public organizations, and all enterprises and undertakings must abide by the Constitution and the law." Importantly, this text from Article 5(4) strongly suggests that a political party is *not* a "state organ[...]" or an "enterprise[...]" or an "undertaking[...]." First-off, it is self-evident that the Party is not part of the "armed forces."[24] Second, if the CCP were an organ of the state, then it would have been illogical to have referred to "political parties" separately from those other sorts of entities being instructed to abide by the law.

It further appears that the separation of the CCP from the State has become even more clear over time. For example, earlier, the CCP carried out certain government-like functions at the municipal level, but "[t]his... met with the disapproval of the state and Party leadership" and, from 1961 onward, was explicitly forbidden.[25] Earlier PRC Constitutions (1975 and 1978) contained a so-called "party article," but the current one (ratified December 4, 1982) does not.[26] While on given occasions in the past some other foreign states appear to have received CCP officials as though they were government representatives,[27] the status of such officials depended on the particular transactions or tasks they were carrying out.[28] Even as early as the 1980s, PRC jurists

---

[23] *Id.*

[24] *Id.*

[25] Robert Heuser, *The Legal Status of the Chinese Communist Party,* OCCASIONAL PAPERS IN CONTEMPORARY ASIAN STUDIES (U. Md. 1987) at 7.

[26] Heuser at 5.

[27] *Id.* at 14-15.

[28] This approach of third states recalls, at least in a general way, the approach that the Second Circuit took in *Tachiona,* 386 F.3d at 219.

stated that the CCP had no formal role in China's international treaty relations.[29]  This evidence about the evolution of the CCP's role further supports the conclusion that the CCP is *not* an agency or instrumentality of the Chinese state.

### 3.     *International authorities do not support the contention that a political party is a "foreign state."*

Finally, international authorities have not indicated any presumption that political parties constitute a "foreign state" or part thereof.  In fact, when opportunity has arisen to identify examples where a political party constituted a state or part thereof, no examples were given.

The United Nations International Law Commission (ILC), a body that U.S. courts have relied on for its statements of international law on various topics,[30] spent 52 years (1949-2001) studying and drafting provisions to address the law of state responsibility—*i.e.*, the law that concerns, *inter alia,* what organs constitute "organs of a State";[31] what conduct by other persons or entities is conduct "exercising elements of governmental authority";[32] and what conduct is conduct "directed or controlled by a State."[33]  While the ILC did not explicitly say that a political party could *never* be a state organ, or exercise governmental authority, or be directed or controlled

---

[29] See Heuser at 14 n.46 (quoting Wang Jieya, *International Law,* Beijing 1981, at 311).

[30] See, e.g., *U.S. v. Louisiana,* 394 U.S. 11, 36–37, 44–47 (1969); *U.S. v. Postal,* 589 F.2d 862, 878 (5th Cir. 1982).

[31] ILC Draft articles on Responsibility of States for Internationally Wrongful Acts, draft art. 4: INT'L L. COM. YEARBOOK 2001, Vol. II, Part Two, p. 40.

[32] *Id.* draft art. 5, p. 42.

[33] *Id.* draft art. 8, p. 47. At least one court in this district has referred to draft art. 8 when considering whether an actor was "in fact acting on the instructions of, or under the direction or control of, [a] State in carrying out the conduct [in issue]."   *See Aldana v. Fresh Del Monte Produce, N.A. Inc.,* 305 F. Supp. 2d 1285, 1303 (S.D. Fla. 2003).  The 11th Circuit, vacating in part, did not criticize the reference to ILC draft art. 8. *See Aldana v. Del Monte Fresh Produce, N.A., Inc. (Aldana II)*, 416 F.3d 1242 (11th Cir. 2005).  The 11th Circuit, considering a question of diplomatic immunity, relied on the ILC in *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1296 (11th Cir. 1999).

by a state, in the decades of its work on State responsibility, the ILC does not appear to have given any example in which a political party was in fact found to be in any such position.[34]

In the approximately three dozen reports on State responsibility from 1956 to 2001 preparatory to the final draft articles and Commentaries, successive ILC Special Rapporteurs took account and recorded learned input from the four dozen eminent jurists who serve as ILC Members at any given time, and who represent all the major legal systems and regions of the world.  Yet, in those voluminous reports, there is but one example of a political party, socialist party, or communist party that *might* have been treated like a state.[35] That example concerned the Communist Party of the Soviet Union (CPSU).  But the possibility of the CPSU being treated as a state actor sprung from an explicit provision in the then-Constitution of the USSR—Article 126— which assigned a specific place in the USSR's government to the CPSU.[36] Today's PRC Constitution, as stated, *supra*, does nothing similar, and in fact does not mention the CCP in any operative provision at all.

While the ILC's absence of examples is not dispositive, it strongly supports the position taken by U.S.  courts, including this one, that a defendant in the posture of the CCP carries the burden of proof, and must make specific showings of fact and law to establish that it is a "foreign

---

[34] To put in context the scarcity—or complete absence—of state responsibility of a political party in the ILC's work, it should be noted that the ILC adduced vast amounts of expert material during the drafting work and related discussions.  The ILC's Commentaries accompanying its draft articles on State responsibility run to over a hundred pages of small type and are rich with examples of many kinds of organs, entities, individuals, groups, etc., that for international law purposes, in given situations, were found to be a "state" or a part or agent or instrumentality thereof.  Yet, no example is given in the Commentaries of a political party being in that position.  The Commentaries do not so much as mention political parties as possibly being in that position.

[35] For links to the reports, *see* https://legal.un.org/ilc/guide/9_6.shtml.  By a rough tally, the reports run over 1,600 pages in total.

[36] *Third Report on State Responsibility*, Roberto Ago, Special Rapporteur: Int'l L. Com. Yearbook 1971, Vol. II (1), p. 254, ¶ 165.

state" or an organ, political subdivision, agency, or instrumentality thereof.[37] The CCP has not

done so in this case.

For the reasons set out in this Part, the CCP is not a "foreign state" for purposes of the

FSIA. Therefore, no exception to the FSIA is required for the Court to exercise jurisdiction over

the CCP for the wrongful conduct in regard to COVID-19 for which Plaintiffs seek redress.[38]

As a brief side note, should the Court agree with Plaintiffs, Plaintiffs assert that the nature

of the CCP's activities and presence both in Florida and elsewhere will satisfy personal jurisdiction

concerns, and will be further addressed in Plaintiffs' forthcoming Second Amended Complaint.

Moreover, Plaintiffs' prior attempts to effect service (including the FSIA steps 3 and 4 if the Court

should wait to determine if the CCP is sovereign) should satisfy the requirements of Fed.R.Civ.P.

4 with respect to the CCP as a foreign non-sovereign party, but may require the court to make a

specific determination under Rule 4.  More specifically, Plaintiffs would ask the Court to use the

authority specifically granted in Rule 4 to either treat the prior service already given in earlier

phases of this case as effective with respect to non-sovereign parties, like the CCP, under Rule

4(f)(2)(C)(ii) ("using any form of mail that the clerk addresses and sends to the individual and that

requires a signed receipt" or under 4(f)(3) ("by other means not prohibited by international

---

[37] Where it is not obvious that a defendant is a foreign state, the initial burden of proof is on the defendant to establish that it is a "foreign state" for FSIA purposes. *Santilli v. Cardone,* Case No. 07-cv-308, 2008 U.S. Dist. LEXIS 111677, at *1–4 (M.D. Fla. June 4, 2008); *Bird Wingate, LLC II*, 2010 U.S. Dist. LEXIS 130821 at *7; *see also Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1016 (2d Cir. 1993); *Odyssey Marine Exploration, Inc. v. Unidentified, Shipwrecked* Vessel, 675 F. Supp. 2d 1126, 1138 n.14 (M.D. Fla. 2009); *AT&T Corp. v. Bah. Tourist Office*, Case No. 04-cv-60249, 2005 U.S. Dist. LEXIS 57548 at *8 (S.D. Fla. Aug. 17, 2005).
[38] *See* First Amended Class Action Complaint ("FAC"), ¶¶ 172–217.

agreement, as the court orders"), or to grant the Plaintiffs an additional thirty days to effect service on the CCP via mail.[39]

## B.   In the Alternative, If the Court Were to Find That an Exception to the FSIA Is Required for the CCP, Then the CCP Falls Within One or More FSIA Exceptions

If the Court were to disagree and find that the CCP should be treated as a "foreign state" under the FSIA, then Plaintiffs submit (in the alternative only) that the CCP falls under the exceptions set out in § 1605(a)(2) (commercial activity exception) and § 1605(a)(5) (tortious act or omission exception), for the same reasons as the PRC, and its agents and instrumentalities, as are set forth below.

## III.   Defendant PRC and Any Other Defendant Judged to Be a "Foreign State" for FSIA Purposes, Falls Under the Exceptions to Immunity Indicated In §§ 1605(a)(2), 1605(a)(5), and 1605B.

As 28 U.S.C § 1330(b) provides, "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under ... [§ 1330(a)] where service has been made under section 1608 of this title."  28 U.S.C § 1330(b) (Lexis 2021). Plaintiffs have addressed service under § 1608 in **Part I**, above.

Turning to §1330(a), that provision, in pertinent part, reads as follows:

---

[39] There is significant debate in precedent and the literature about how best to handle service on such a foreign party when the same foreign sovereign has rejected the same attempts at service via the methods already explored in earlier phases of this case, and also has disallowed service on its domestic non-sovereign parties by mail through the Hague Convention, as has China.  But at the same time there is broad recognition of the inherent need to allow some form of service as well as the power expressly granted in Rule 4 to the Court to determine the best method for a particular case.  *See*, *e.g.*, *Papir v. Wurms,* Case No. 02-cv-3273, 2005 U.S. Dist. LEXIS 2201, at *13 (S.D.N.Y. Feb. 15, 2005) (holding that while service did not comply with Rule 4(f)(2)(C)(2), it was nevertheless proper as only practicable method and effective in managing contrasting views from other opinions).  *See also*, *Permanent Bureau of the Hague Conference on Private International Law, Practical Handbook on the Operation of the Hague Service Convention* (3d ed. 2006), at pp. 75-79 (reviewing cases and summarizing same overall conclusion).  In this case, because China's Central Authority has already refused service it would likely be futile to attempt service again through that same channel.

"[t]he district courts shall have jurisdiction... against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity under sections 1605-1607 of this title..."

§ 1330(a). When a plaintiff has "assert[ed] at least some facts that would establish [an] exception [to immunity under §§ 1605-1607]," a defendant claiming immunity "bears the ultimate burden of proving the nonapplicability of the exception." *Stena Rederi AB v. Comision de Contratos*, 923 F.2d 380, 390 n.14 (5th Cir. 1991); *see also Frank v. Comm. of Antigua & Barbuda,* 842 F.3d 362, 367 (5th Cir. 2016).

As detailed more fully *infra*, each Defendant here falls under one or more of the exceptions to immunity set out in § 1605(a)(2), (5), and § 1605B. Thus, no Defendant[40] is entitled to immunity.

## A.     The Wrongful Conduct of the PRC and Its Political Subdivisions, Agencies, and Instrumentalities Falls Under the Commercial Activity Exception of § 1605(a)(2).

Separate and independent of any other exception that might apply, the wrongful conduct of the PRC and its political subdivisions, agencies, and instrumentalities falls under the commercial activity exception of § 1605(a)(2). Under § 1605(a)(2), a defendant is not entitled to immunity when a plaintiff's action is "based upon" any one or more of the following:

(i) "a commercial activity carried on in the United States by the foreign state" *or*

(ii) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere" *or*

(iii) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

---

[40] With the exception of the CCP, as argued, *supra*, it appears that the remaining Defendants would fall under a definition of a "foreign state" for the purposes of the FSIA, unless other information should come to light in the course of litigation.

§ 1605(a)(2).  Defendants here have caused serious injury to Plaintiffs through a range of commercial activities that are the direct cause of the COVID-19 pandemic and its worsening spread and impact.  In keeping with the well-recognized commercial activities exception to immunity, as detailed further below, Plaintiffs base an action against Defendants upon acts outside U.S. territory in connection with a commercial activity of Defendants elsewhere, those acts having caused direct effects in the United States.  As the 11th Circuit has stated, Congress intended foreign commercial activity to be subject to the § 1605(a)(2) exception where "the conduct and its effect are generally recognized as constituent elements of a ... tort under the law of states that have reasonably developed legal systems." *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1544 n.13 (11th Cir., 1993).[41]

### 1. *Defendants' acts that are the direct cause of injuries for which Plaintiffs seek relief are "<u>commercial activity.</u>"*

"Commercial activity," which is a necessary element of the § 1605(a)(2) exceptions, is defined in § 1603(d) as follows:

> "A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."

According to the Supreme Court*,* "a state engages in commercial activity ... where it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns."  Put differently, a foreign state engages in commercial activity only where it acts "in the manner of a private player within" the market."  *Saudi Arabia v. Nelson,* 507 U.S. 349, 360 (1993) (abrogated on other grounds); *accord Devengoechea v. Bolivarian Rep. of Venez.,*

---

[41] *See also* H.R. Rep. No. 94-1487 at 19, 1976 U.S.C.C.A.N. at 6618; *Restatement (Second) Foreign Relations Law of the United States*, § 18 at 47 (1965).

889 F.3d 1213, 1220–21 (11th Cir. 2018).  Defendants' commercial activities that have injured Plaintiffs fall squarely within this Supreme Court description of "commercial activity" for purposes of § 1605(a)(2).[42]  The government participates in the "wet markets," which operate like any vendor/consumer operationg, by providing and supporting the exotic animal trade.  And as well described in the FAC, the China Academy of Sciences, and the Wuhan Lab, actively participate in the pharmaceutical markets, among other industries that are traditional private market enterprises.[43]  The Second Amended Complaint will expand these allegations, with new information gathered since May 2020.

2. ***Plaintiffs' action is "__based upon__" Defendants' acts outside the U.S. in connection with commercial activity.***

For an action to fall within the § 1605(a)(2) exception, a plaintiff must show "something more than a mere connection with, or relation to, commercial activity." *Nelson*, at 348.  The cause of action must form the "gravamen" of the suit:  it must be *"based upon"* the commercial activity. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 34 (2015).  While the FSIA "contains no definition of the phrase "based upon," the Supreme Court has pointed out that the phrase "is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  *Nelson* at 357.

Although in *Nelson* and *Sachs* the Supreme Court determined a plaintiff failed to meet the "based upon" requirement, in contrast here, the FAC is based upon commercial activity of Defendants that does not share the defects found those cases.

In *Nelson,* the plaintiff, while in the United States, was hired to work in a Saudi government hospital.  *Nelson*, at 351–52.  He went to Saudi Arabia and worked awhile without incident.  *Id.* at

---

[42] *See* FAC, *e.g.*, ¶¶ 47–49, 54, 76.
[43] *See id.*

351. Then, in apparent retaliation for his attempts to alert authorities about safety problems at the hospital, Saudi police arrested him, jailed him, and tortured him. *Id.* at 352–53. Nelson sued in the United States and drew attention to activity that was undoubtedly commercial activity—his engagement to do hospital work. However, that commercial activity was not what caused his injuries. *Id.* at 363. The injuries were caused, instead, by activity that does not fit the "commercial activity" definition—namely, Nelson's arrest, detention, and torture by the Saudi police, and police are long recognized to be instrumentalities of the state. It is therefore not surprising, nor in any way apposite to the very different facts of our case, that the Supreme Court found that Nelson's action was "based on" the governmental activity, not on the commercial activity.

But Plaintiffs' allegations here are based on Defendants' commercial activity—*i.e.*, Defendants' commercial activity in healthcare, pharmaceutical research and investment, biotech, "wet markets," as well as commercial efforts to manipulate the product markets for sales and transport of personal protective equipment, etc.—which Plaintiffs have identified and which commercial activity is itself the cause of the harm that Plaintiffs have suffered. Plaintiffs' action here is not like Mr. Nelson's, which depended on the allegedly inappropriate discharge of very traditional functions of a sovereign state, namely, the arrest and detention by its own police force. Harm that has come to Plaintiffs in this case is the direct result of the commercial activity of Defendants. No separate, governmental, non-commercial act is the proximate cause of these particular harms.[44] Plaintiffs here plead an action where the gravamen is Defendants' commercial activity and the injuries it has caused.

A similar difference underlies the facts of *Sachs*, where the plaintiff, a California resident, used a Massachusetts-based firm to buy a train ticket for later use in Austria. 577 U.S. at 30. Then,

---

[44] Plaintiffs do allege, separately, non-commercial tortious conduct

while visiting Austria, the plaintiff fell onto the train tracks and suffered grievous injury as a result. *Id.* However, the plaintiff's "commercial activity" exception was based only upon the ticket sale. *Id.* at 31–32. The Supreme Court found that the ticket sale was not the gravamen of plaintiff's suit, because no harm came from that discreet commercial activity. *Id.* The Supreme Court pointed out that "the conduct constituting the gravamen of Sach's suit" was the foreign government's operation of the railway in Austria and, therefore, Sachs' suit was outside of the exception and failed. *Id.* at 35–38. According to Chief Justice Roberts, writing for the Court, "[a]ll her claims turn on the same ... episode in Austria, allegedly caused by wrongful conduct and dangerous conditions in Austria, which led to injuries suffered in Austria" at the hands of the government-run railway. *Id.* at 35. Justice Roberts, hammering the point home, quoted Justice Holmes, in a letter to then-Professor Frankfurter: "the 'essentials' of a personal injury narrative will be found at the 'point of contact'—'the place where the boy got his fingers pinched.'" *Id.* at 36. To establish the commercial immunity exception, those "essentials" of the narrative must both supply the basis of the exception *and* constitute the gravamen of the plaintiff's claim that the defendant injured her. The defect in the *Sachs* and *Nelson* actions was that the activity that fell within the immunity exception was not the activity that injured the plaintiff.

In contrast here, Plaintiffs based an action upon Defendants' commercial activity, with *that* activity, itself, being "the conduct constituting the gravamen of [Plaintiffs'] suit," and its consequences have landed with devastating impact, not on a plaintiff abroad, but upon millions of victims in the United States. As a result, the facts of this case fall squarely within the long-recognized confines of the commercial activities statutory exception to sovereign immunity.

### 3.    Defendants' acts have had a *direct effect* in the U.S.

Under § 1605(a)(2), a defendant's acts must have had a "direct effect" in the U.S. Directness, for purposes of § 1605(a)(2), means "in a straight line without deviation or interruption." *Crystallex Inter'l Corp. v. Venez.,* 251 F. Supp. 3d 758, 770 (D. Del. 2017).

The precedents here are squarely in Plaintiffs' favor, as the Supreme Court held, in *Republic of Argentina v. Weltover,* when it determined that an act in Argentina—the unilateral rescheduling of the maturity dates on certain bonds—had a "direct effect" in the United States for § 1605(a)(2) purposes.  504 U.S. 607, 618–19 (1992); *see also S & Davis Int'l., Inc. v. Rep. of Yemen,* 218 F.3d 1292, 1304 (11th Cir. 2000).  The direct effect in that case was that Argentina's payments into certain non-U.S. corporations' New York bank accounts were delayed: "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming." 504 U.S. at 618–19  It did not matter that the disappointed corporations (the original plaintiffs against Argentina) were all foreign corporations with no other connections to the U.S.  It appears that the *Weltover* bondholders just happened to choose New York bank accounts as the destination of bond payments.[45]  One might hypothesize an overseas transaction even less significant than Argentina's change of maturity dates on bonds and having an even lighter touch on U.S. soil. The COVID-19 pandemic, however, is no mere "ripple[...] caused by an overseas transaction" that "manage[d] eventually to reach the shores of the United States." *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n,* 33 F.3d 1232, 1238 (10th Cir. 1994) (internal quotation omitted). Plaintiffs here are U.S. citizens, and Defendants' wrongful conduct foreseeably and directly resulted in the injuries that they have suffered.

---

[45] They were "all foreign corporations with no other connections to the United States." 504 U.S. at 619.

This approach is entirely consistent with the approach followed across lower courts where the meaning of "direct" has been expressed as follows:  "In determining whether an act had a direct effect in the United States; '[t]he question is, was the effect sufficiently direct and sufficiently in the United States that Congress would have wanted an American court to hear the case?'"  *Frank v. Comm. of Antigua & Barbuda,* 842 F.3d 362, 368–69 (5th Cir. 2016).  The direct and catastrophic effects of Defendants' wrongful conduct in the present case, conduct which has caused the deaths of over a half million Americans and the loss to the American economy of trillions of dollars, are "sufficiently 'direct' and sufficiently 'in the United States,'" that "Congress would have wanted an American court to hear [this] case."  *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1111 (5th Cir. 1985) (quoting *Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 313 (2d Cir. 1981)); *see also Frank,* 842 F.3d at 368–69. Defendants' wrongful conduct affected the Plaintiffs through "a straight line without deviation or interruption." *See Crystallex*, 251 F. Supp. 3d at 770.

To hold otherwise would ignore the "direct effect" case law.  For example, if Defendants had made appearances in these proceedings, they might have demanded that the Court hold that the effect of their wrongful conduct was *not* direct: Defendants (Defendants might claim) themselves did not physically act as vectors carrying COVID-19 throughout the world.  That would be a factually baseless defense, because some of Defendants' personnel, including personnel engaged in commercial activity, *did* themselves carry COVID-19 to countries throughout the world, including the United States.[46] And it would also be a legally baseless defense, because to

---

[46] Moreover, as alleged in the FAC, ¶¶ 57, and 151, Defendants have/had personnel and agents throughout the United States that contributed to suppression and concealment of information and helped the pandemic spread.  Plaintiffs research has uncovered more evidence of the work of PRC and CCP agents in the U.S. contributing to what unfolded in late 2019 and early 2020, which would be part of a Second Amended Complaint that the Court has granted leave to file.

require such an extremely high standard of directness would go against established binding precedents like the Supreme Court's in *Weltover*. In *Weltover,* the Argentine government used international communications networks and companies to transmit news of the postponement of bond payments; and the corporations that held the bonds made the choice to locate their bank accounts in the U.S. and the further choice to tell Argentina to wire money to those particular accounts, rather than, say, accounts in the corporations' home countries. Those steps were, in a real sense, intermediate between the commercial act and that act having an effect in the United States. Nevertheless, the Supreme Court held that Argentina's postponement of bond payments had "direct effect" in the United States for § 1605(a)(2) purposes. Under *Weltover,* "direct effect" is not limited to situations that display an instantaneous co-location of cause-and-effect. The Supreme Court got *Weltover* right,[47] and Defendants' wrongful conduct in regard to COVID-19 has had direct effect in the United States for purposes of § 1605(a)(2).[48]

For the reasons above, Defendants' wrongful conduct falls within the § 1605(a)(2) exception.

**B.    The Wrongful Conduct of the PRC and Its Political Subdivisions, Agencies, and Instrumentalities Falls Under the Tortious Act or Omission Exception of § 1605(A)(5)**

---

[47] The Supreme Court has continued to agree with its *Weltover* decision in recent judgments. *See*, *e.g.*, *Jam v. Int'l Finance Corp,* 139 S. Ct. 759, 772 (2019) (citing *Weltover* at 612–13, 614); *Bolivarian Rep. of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1324 (2017) (citing *Weltover*, at 610). *See also R&R Int'l Consulting LLC v. Banco do Brasil, S.A.*, 981 F.3d 1239, 1244 (11th Cir. 2020); *Africa Growth Corp. v. Republic of Angl.*, Case No. 09-cv-21995, 2019 U.S. Dist. LEXIS 204212 at *10 (S.D. Fla. Nov. 25, 2019).

[48] Other wrongful conduct of Defendants—such as the withholding and suppression of information about COVID-19—had practically instantaneous, direct effect in the United States, causing massive loss and injury to Plaintiffs. *See* FAC, *e.g.*, ¶¶ 84–117.

Separately and independently of any other exception that might apply, the wrongful conduct of the PRC and its political subdivisions, agencies, and instrumentalities falls under the tortious act or omission exception of § 1605(a)(5).

Under § 1605(a)(5), a foreign state is not entitled to immunity, if there has been a tortious act "occurring in the United States;" that act is "caused by [a] tortious act or omission;" and the alleged acts or omissions were those of a "foreign state or of any official or employee of that foreign state," and those acts or omissions were done "within the scope of [the official's or employee's] office or employment."[49]

### 1. *Defendants' conduct is not protected by either of the § 1605(a)(5) safe harbors.*

Two safe harbors restrict the situations in which the § 1605(a)(5) exception applies: first, where the claim is "based upon the exercise or performance or the failure to exercise or perform a *discretionary function* regardless of whether the discretion be abused;" and, second, where the claim arises "out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." § 1605(a)(5)(A), (B) (emphasis supplied).  The second safe harbor does not apply here because Plaintiffs' action has nothing to do with "malicious prosecution... [etc.]" as those terms are used in that safe harbor clause.  The first safe harbor— discretionary function—does not apply here either but merits a brief word.

In evaluating whether the discretionary function safe harbor applies, courts use a two-step test set down by the Supreme Court.  *See Berkovitz v. United States,* 486 U.S. 531, 536–37 (1988); *United States v. Gaubert,* 499 U.S. 315, 322–23 (1991).  The first step is to say whether the conduct in question "is a matter of choice for the acting employee."  *Berkovitz,* at 536.[50]  In the present

---

[49] *See* synopsis, *O'Bryan v. Holy See*, 556 F.3d 361, 380-81 (6th Cir. 2009).
[50] *See also Swafford v. United States,* 839 F.3d 1365, 1370 (11th Cir. 2016) (citing *Berkovitz*).  The colloquy in *Foster Logging, Inc. v. United States,* 973 F.3d 1152, 1163-64 (11th Cir., Hull, J.; and

case, Plaintiffs submit on information and belief that Defendants' personnel were *not* acting in China or in the United States as a "matter of choice." They were acting under the dictates of Defendants. Given the apparent fate of employees in the PRC like Dr. Ai Fen at the Wuhan Central Hospital, who tried to speak out about COVID-19 and eventually "disappeared,"[51] Plaintiffs submit that Defendants' personnel had no discretion, legal or practical, about their acts or omissions regarding tortious acts and omissions of Defendants. The discretionary safe harbor does not apply.

Moreover, there is no "discretionary acts" safe harbor for acts such as those of Defendants, because: (1) those acts are clearly contrary to the precepts of humanity; (2) the internal laws of the country in question and of its subdivisions prohibit those acts; and (3) Defendants failed to warn of a known danger.[52] "[T]here is no discretion to commit, or to have one's officers or agents commit, an illegal act," all the more so where the act concerned is "clearly contrary to the precepts of humanity as recognized in both national and international law." *Letelier v. Rep. of* Chile, 488 F. Supp. 665, 673 (D.D.C., 1980).[53]

2. ***Plaintiffs have alleged tortious conduct of Defendants <u>occurring in the United States</u>.***

---

Jordan, J., dissenting, 2020) about the two-step test does not affect its applicability to the present setting. *See also Broidy Capital Mgmt., LLC v. Qatar,* 982 F.3d 582, 591 (9th Cir. 2020); *Kurd v. Republic of Turkey,* 438 F.Supp.3d 69, 83 (D.D.C. 2020) (each using the test).

[51] *See* FAC, ¶ 96. Moreover, the FAC's allegations are replete with examples of employees being coerced into conduct. *See, e.g.*, ¶¶ 98–102, 106, 114–15.

[52] *See* FAC, ¶¶ 55–56, 193.

[53] *See also*, *Wilhite v. United States,* Case No.19-cv-102, 2020 U.S. Dist. LEXIS 159295, at *12 (D. Mont., Aug. 31, 2020) (quoting *Letelier* with approval); *Al Shimaria v. CACI Premier Technology*, Inc., 368 F.Supp.3d 935, 966–67 (E.D. Va. 2019) (same).

Turning to the affirmative requirements set down in the main body of the § 1605(a)(5) immunity exception, Plaintiffs have identified tortious acts and omissions by Defendants or their officials or employees that are embraced by the exception.[54]

While it is clear that a tort, to be covered by § 1605(a)(5), must "occur[...] within the territorial jurisdiction of the Untied States," *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 (1989), "not 'every aspect of the tortious conduct' must 'occur in the United States.'" *Broidy Capital Mgmt.*, LLC,982 F.3d at 590 (quoting *Olsen v. Gov't of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984)).  For example, the § 1605(a)(5) exception applied to the Republic of China (Taiwan) under California doctrine of *respondeat superior*, after two men, allegedly on orders of an official in Taiwan, shot and killed plaintiff's husband in California.  *Liu v. Republic of China,* 892 F.2d 1419, 1421, 1431 (9th Cir. 1989).  Discussions and planning of the killing allegedly took place outside the U.S., *id.* at 1422–23, but that was not a factor to prevent the court from applying the § 1605(a)(5) exception.

In *Letelier*, *supra*, a former Chilean ambassador and his colleague, a former Chilean foreign minister, were killed by a car bomb in Washington, DC.  488 F. Supp. at 665–66.  Plaintiffs alleged that the murder was carried out in concert with and under the direction and aid of the Republic of Chile, including its intelligence agency (an organ based in Chile).  *Id.*  The § 1605(a)(5) exception applied.  *Id.*

In *Olsen*, *supra*, the Ninth Circuit rejected Mexico's theory that the § 1605(a)(5) exception applies only where the tortious conduct occurred entirely in the United States. According to the court, it would misconstrue the FSIA to require that none of a defendant's conduct took place outside the United States, and, moreover, would incentivize sovereign defendants to insulate

---

[54] *See* FAC, *e.g.*, ¶¶ 89–102, 146–47, 174, 201.

themselves from jurisdiction by simply "alleg[ing] that some tortious conduct occurred outside the United States."  729 F.2d at 646.[55]

Where a plaintiff has failed to satisfy the requirement of a tort in the United States under §1605(a)(5), this has been, as in *In the Matter of SEDCO,* where "[t]he alleged acts or omissions made the basis of th[e] lawsuit *all* took place in [a foreign state] or its territorial waters."  543 F. Supp. 561, 567 (S.D.Tex., 1984) (emphasis added).  In that case, a plaintiff alleged injury from an oil spill, but the accident resulting in the release of oil was outside the United States and *no* noncommercial act or omission of a defendant concerning the matter took place in the United States.  *Id.*  Similarly, in *Fukudo v. Ministry of Foreign Affairs of Japan*, the plaintiff alleged "*no claim* based on conduct occurring in the United States."  2017 U.S. Dist. LEXIS 9550 at *8 (emphasis supplied).  There was *no* allegation of "facts indicating that the Ministry of Foreign Affairs [of Japan] acted outside the borders of Japan."  *Id.*

In *Kidane v. Ethiopia*, Ethiopia allegedly sent a computer virus to a plaintiff's computer. 851 F.3d 7, 10 (D.C. Cir., 2017).  The plaintiff failed to allege any conduct by officials or employees of Ethiopia in the United States.  *Id.*  While in *Kidane* it is true that the alleged wrongful conduct was "completed in the United States," it "began outside the United States" and no physical presence in the United States of any Ethiopian government official or employee was alleged to have been involved.  *Id.*

In *Asociacion de Reclamantes,* the plaintiffs—allegedly, successors in interest to colonial-era land grants in Mexico—did not contend that "*any* of Mexico's acts that could conceivably be regarded as having been committed on United States soil... was in and of itself tortious."  735 F.2d

---

[55] Later abrogation of *Olsen* was on other grounds.  Courts have continued to rely on *Olsen* for the proper interpretation of the "entire tort rule" for purposes of establishing the § 1605(a)(5) exception.  *See*, *e.g.*, *Broidy Capital Mgmt., LLC*, 982 F.3d at 588.

1517, 1524 (D.C. Cir., Scalia, J., 1984) (emphasis added).   In *Jerez v. Cuba,* the defendants inflicted the injury on the plaintiff "*entirely* in Cuba."   775 F.3d, 419, 424 (D.C. Cir., 2014) (emphasis supplied).[56]

By contrast to the conduct in *SEDCO, Fukudo, Kidane, Asociacion de Reclamantes,* and *Jerez*, wrongful conduct of Defendants in the present case included acts and omissions carried out by Defendants' officials and employees in the United States.[57]   Plaintiffs here therefore have alleged the elements of torts committed by Defendants in the United States for purposes of the § 1605(a)(5) exception. The fact that Defendants might have committed *other* torts outside the United States does not prevent the application of the § 1605(a)(5) exception to those that took place on U.S. soil.

Plaintiffs additionally note that, with a global pandemic afoot and spreading from Wuhan, Defendants' officials and employees in the United States said nothing to alert Americans of the danger.[58]   On information and belief, those officials and employees were under direction to carry out this wrongful omission, as well as to misinform.   The tortious conduct constituted by those acts and omissions, like Defendants' other non-commercial tortious conduct, took place in the United States, and the injuries it inflicted were in the United States. The § 1605(a)(5) exception therefore applies.

---

[56] Senior Circuit Judge Williams seems to have suggested that, if, instead, a virus package or a bomb had been sent to the United States and released or set off here, then the immunity exception might have applied.  *See* 775 F.3d at 424.

[57] *See* FAC ¶¶ 57, 151.

[58] Defendants maintain across the United States a massive apparatus of officials and employees, all of whom act in accordance with the PRC's and/or the CCP's dictates.  Some of these officials and employees are diplomats and consular personnel; China maintains a large embassy in Washington, DC, plus consulates in five other cities.  *See* FAC ¶ 57.  Some of Defendants' officials and employees perform other functions, such as media and cultural and educational functions.  As stated, *supra*, the Second Amended Complaint will expand these allegations from new research and evidence since the FAC was drafted in May 2020.

3.      _**Tortious acts or omissions**_ *of Defendants.*

For the immunity exception of § 1605(a)(5) to apply, a plaintiff must allege facts that fulfil

the elements of a tort.  Courts turn to state tort law to identify whether a tort has been alleged for

§ 1605(a)(5) purposes.  As the Sixth Circuit has stated:

> In determining whether the tortious act exception applies, courts, as a rule, apply
> state substantive law:  "where state law provides a rule of liability governing private
> individuals, the FSIA requires the application of that rule to foreign states in like
> circumstances." ... Therefore, to determine the applicability of the tortious act
> exception, we must consider the elements of the exception, applying ... state law
> where applicable.

*O'Bryan*, *supra*, at 381 (quoting *First Nat'l City Bank v. Banco Para El Comercio Exterior*

*De Cuba,* 462 U.S. 611, 622 n.11 (1983)); (citing *Pescatore v. Pan Am,* 97 F.3d 1, 12 (2d Cir.

1996); *Dammarell v. Islamic Rep. of Iran*, Case No. 01-cv-2224, 2005 U.S. Dist. LEXIS 5343, at

\*54-56 (D.D.C. Mar. 29, 2005).  Plaintiffs have identified the wrongful conduct of Defendants that

constitutes a tort under the relevant law. [59]

**C.      The Wrongful Conduct of the PRC and Its Political Subdivisions, Agencies,
and Instrumentalities Falls Under the International Terrorism Exception of §
1605B.**

Separately and independently of any other exception that might apply, the wrongful

conduct of the PRC and its political subdivisions, agencies, and instrumentalities falls under the

international terrorism exception of 28 U.S.C. § 1605B. Under § 1605B, a foreign state "shall not

be immune," where the injury occurred in the U.S. and was "caused by—(1) an act of international

terrorism in the United States; and (2) a tortious act or acts of the foreign state, or of any official,

employee, or agent of that foreign state while acting within the scope of his or her office,

---

[59] *See, generally*, FAC, and Counts I –III, V–VII.

employment, or agency, regardless where the tortious act or acts of the foreign state occurred." §

1605B(b)(1), (2).

The "tortious act" in subsection (2) of § 1605B(b)is governed by the same "traditional test

for proximate causation that has been applied elsewhere in the FSIA context." *In re: Terrorist*

*Attacks on September 11, 2001*, 298 F.Supp.3d 631, 645–46 (S.D.N.Y. 2018). This test requires

merely "some reasonable connection between the act or omission of the defendant and the damage

which the plaintiff has suffered," that connection, in turn, requiring two elements: (*i*) a showing

that defendant's conduct was "a 'substantial factor' in the sequence of events that led to the

plaintiff's injury" and (*ii*) a showing that "the plaintiff's injury [was] 'reasonably foreseeable or

anticipated as a natural consequence of' the defendant's actions." *Id.* at 645–46 (internal quotation

omitted) (quoting & citing *Owens v. Rep. of Sudan*, 864 F.3d 751, 794 (D.C. Cir., 2017); *Rothstein*

*v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013); *Paroline v. U.S.*, 572 U.S. 464 (2014)). Plaintiffs have

set out the factual bases to show that Defendants' conduct was *at least* "a substantial factor" in the

COVID-19 pandemic that led to Plaintiffs' injuries;[60] and to show that those injuries are the

"foreseeable [and] anticipated ... natural consequence of the [Defendants'] actions."[61] Therefore,

Plaintiffs have fulfilled subsection (2) of § 1605B(b).

Turning to subsection (1) of § 1605B(b), the term "international terrorism" is defined for

purposes of that provision in 18 U.S.C. § 2331, which reads, in pertinent part, as follows:

"[T]he term 'international terrorism' means activities that—

(A) involve... acts dangerous to human life that are a violation of the criminal laws
of the United States or of any State, or that would be a criminal violation if
committed within the jurisdiction of the United States or of any State;

(B) appear to be intended—

---

[60] *See* FAC, *e.g.*, ¶¶ 89–102, 146–47, 174, 201
[61] *See id.*

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

18 U.S.C. § 2331 (Lexis 2021).  The facts alleged in Plaintiffs' FAC fulfill the elements of "international terrorism" as defined in 18 U.S.C. § 2331.

First, there is no doubt that the facts alleged show that Defendants carried out "activities" that at least "involve" acts that are "dangerous to human life."[62]  Also, there is no doubt that Defendants' activities, as shown in the facts alleged, at least "involve" acts that violate U.S. laws, or would violate U.S. laws if committed within U.S. jurisdiction.[63]  Thus, Defendants' activities fulfil prong (A) of the 18 U.S.C. § 2331 definition of "international terrorism."[64]

As to prong (B) of the 18 U.S.C. § 2331 definition, Plaintiffs note that a plaintiff at this stage of the proceedings is required only to allege facts that would establish that a defendant has carried out "activities" that "*appear* to be intended" to perpetrate *one* of the three terrorist objectives listed under prong (B).  § 2331(B) (emphasis supplied).  In the FAC, Plaintiffs allege facts that demonstrate that Defendants' activities *at least* "appear to be intended" to perpetrate *all*

---

[62] *See* FAC, ¶¶ 56, 63–75, 89–102, 193.

[63] *See id.*

[64] For sake of completeness, Plaintiffs note that limb (A) would also be fulfilled, if the dangerous acts would violate only some *other* State's criminal laws.  Plaintiffs have alleged facts that demonstrate beyond doubt that other State's criminal laws would be violated by Defendants' activities.  *See id.*

*three* of the terrorist objectives listed under prong (B).[65]  These actions fit well within the pattern of influence operations the government of China has been using to shift policy, practice, and impact of US public and government opinion and policy that our State Department has reported at some length.[66]

As to prong (C) of the 18 U.S.C. § 2331 definition, Plaintiffs have alleged facts that show that Defendants have carried out activities that "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries."  More specifically, much of the underlying actions that form the basis of the complaint in this case are otherwise hard for US courts to access precisely because they were carried out outside of the US even though they were designed to and did influence, intimidate, or otherwise affect the US government and population.[67]

Plaintiffs acknowledge that, in *dicta,* one district court mentioned that the Senate sponsors of the bill that enacted § 1605B said that its purpose "was to close a 'loophole' in the FSIA that resulted in the dismissal of claims by the family members of the victims of the September 11, 2001

---

[65] *See id.*  Plaintiffs further note that, more generally, and outside the context of intimidation, coercion, and mass destruction, there is also clear evidence that the CCP and/or the PRC—including through the latter's embassy and consulates in the U.S.—seeks to influence policy and affect the conduct of the U.S. and allied governments. *See, e.g.*, Angelo Amante, *Pompeo delivers warning to Italy over China's economic influence, 5G*, Reuters (Sep. 30, 2020), *available at* https://www.reuters.com/article/us-usa-pompeo-italy-idUKKBN26L2E9; *China's 'influence operations' in US target local politics: Pompeo* Nikkei Asia (Sept. 24, 2020), *available at* https://asia.nikkei.com/Politics/International-relations/US-China-tensions/China-s-influence-operations-in-US-target-local-politics-Pompeo.

[66] The Elements of the China Challenge, Policy Planning Staff, Office of the Secretary of State, US Department of State, November 2020, revised December, 2020, at 19 ("U.S. government officials and other international observers have noted Beijing's growing efforts to coordinate with Moscow to spread disinformation around the world on COVID-19 … [and pointing out that] this partnership is grounded in shared interests — most notably weakening U.S. power and influence"); at 24 (summarizing broad range of influence operations inside the US).

[67] *See* FAC, ¶¶ 56, 63–75, 89–102, 193.  These factual allegations, which fulfil the definition of "international terrorism," are without prejudice to Plaintiffs' factual allegations that fulfil any requirement that Defendants are responsible for acts or omissions in the United States, to the extent that this Court finds such territorial requirement applicable to any part of Plaintiffs' action.

attacks in New York against foreign entities that allegedly funded the attacks." *Gonzalez v. Google, Inc.*, 282 F.Supp.3d 1150, 1160 (N.D. Cal. 2017) (citing 162 Cong. Rec. S2845-01 (May 17, 2016).  However, nothing in the text of § 1605B in any way limits this sovereign immunities exception to actions by victims of one particular act or to actions for funding an injurious act.[68] Section 1605B, on its plain meaning, embraces the actions that Plaintiffs bring in the present case.

For the reasons set out above, Plaintiffs respectfully request the Court to find that any and all Defendants that constitute a "foreign state" for purposes of the FSIA have engaged in acts and/or omissions that fall within the exceptions to immunity indicated in 28 U.S.C. § 1605(2), § 1605(5), and/or § 1605B.

## **CONCLUSION**

Although Plaintiffs believe there are arguments that China's letter in response to service under § 1608(a)(2) should not be treated as a "certificate" for the purposes of Hague Convention Article 15, they provisionally waive such arguments in the interest of judicial economy.  Instead, Plaintiffs seek the Court's direction on whether service should proceed under the third or fourth steps of § 1608(a), and allow Plaintiffs the limited time required to perfect those efforts.  Also, for step four, to determine and allow that Plaintiffs may communicate directly to the State Department. Furthermore, Plaintiffs have demonstrated that the CCP should not be considered sovereign, but even if the Court should disagree, every Defendant, and the claims here, fall squarely within exceptions to sovereign immunity under the FSIA, and this Court has subject matter jurisdiction.

---

[68] Regarding the FSIA, the Supreme Court has declined to rely on the legislative history, where the natural meaning of the statutory language suffices.  *See Nelson*, *supra*, 507 U.S. at 357; (quoted at *Samco Global Arms, Inc. v. Rep. of Honduras*, Case No. 10-cv-20196, 2012 U.S. Dist. LEXIS 65373, at *25 (S.D. Fla. Jan. 25, 2012).

Respectfully submitted this 15th day of April, 2021.

By:  */s Matthew T. Moore*
Matthew T. Moore, Esq.
Fla. Bar No. 70034
Primary: mmoore@thebermanlawgroup.com
Secondary: service@thebermanlawgroup.com

Joseph F. Stallone, Esq.
Fla. Bar No. 1002843
Primary: jstallone@thebermanlawgroup.com
Secondary:  service@thebermanlawgroup.com

**BERMAN LAW GROUP**
P.O. Box 272789
Boca Raton, FL 33427
Telephone:  (561) 826-5200
Fax: (561) 826-5201

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been filed this April 15, 2021, with the Court's CM/ECF filing system, which shall cause an e-mail notice to be sent to all parties of record in this matter.

By:  */s Matthew T. Moore*
Matthew T. Moore, Esq.
Fla. Bar No. 70034